## HILL *v.* SPEAR.

| 50  253
| 67  116

The validity of a contract is to be decided by the law of the place where it was made, unless it was agreed, either expressly or impliedly, that it should be performed elsewhere ; in which case the general rule is, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance.

Contracts, valid by the law of the place where they are made, are generally valid everywhere, *jure gentium*, and by tacit consent. And if, in the place where the contract is made, the policy of the local law would enforce it, it will also be enforced in the jurisdiction to which a party may be compelled to resort for the application of a remedy for the violation of such contract.

An exception to this rule, however, consists in this: that no nation or State is bound to recognize or enforce any contracts which are injurious to its own interests or the welfare of its own people, or which are in fraud and violation of its own laws.

A man is presumed to know and understand not only the laws of the country wherein he dwells, but also those of the foreign country or State in which he transacts business.

The validity of a vendor's claim to recover the price of goods sold with knowledge that the purchaser intends to make an unlawful use of them, depends upon the circumstance whether or not the original vendor participated actively, to a greater or less extent, in the subsequent unlawful disposition of the goods ; or, whether the expectation of advantage and profit to ·him, growing out of the unlawful disposition of the goods by the purchaser, entered into and constituted a part of the inducement and consideration of the original sale.

If such expectation of advantage to the vendor was an ingredient in the consideration for the original sale, or if the original vendor participated in the subsequent unlawful disposition of the goods, he cannot recover the price of them in our courts.

Mere belief on the part of the seller of goods that the purchaser buys for the purpose of carrying them into another State, to be there re-sold in violation of law, does not invalidate the sale.

The mere solicitation, by a dealer in liquors, of orders in the future for such goods, even though the person soliciting such orders may have had reason to believe, and did believe, that if such liquors should be ordered and purchased they would be re-sold by the purchaser in violation of law, is not such a circumstance as will affect the validity of a subsequent sale of such goods in a State where such sale is not prohibited by law.

E. kept a saloon in M. in this State, where he was accustomed to retail spirituous liquors contrary to law. S. was a dealer in spirituous liquors in

the State of New York, where such traffic was not prohibited. S. had visited E.'s saloon in M., and on one occasion had solicited orders from E. for liquors. Subsequently S. sold to E. a quantity of spirituous liquors. The contract of sale was made and completed, and the goods were delivered in New York. S. had no interest nor concern in the disposition of the liquors by E., and did no act beyond the sale to E. in furtherance of E.'s purpose to sell the liquors in this State; but there was evidence tending to show that S., when he solicited orders from E. and sold him the liquors, had reasonable cause to believe, and did believe, that E. intended to re-sell those liquors at his saloon in this State;—*held*, that the contract of sale, being valid by the laws of New York, should be enforced here.

TROVER, by Joseph G. Hill against Justin Spear, a deputy sheriff, for attaching property on a writ in favor of William Stewart against Dudley B. Emerson. The taking was admitted. The plaintiff's claim to a portion of the property was founded on an alleged purchase from Emerson, the validity of which was disputed by the defendant.

One question on trial was, whether Stewart was a creditor of Emerson. It appeared that Stewart lived in New York; that a liquor saloon was kept in Manchester, N. H., prior to June, 1865, by Elijah Perry; from June, 1865, to June, 1866, by Hill & Emerson; and after June, 1866, by Dudley B. Emerson; that all these parties had bought liquors of Stewart, which were retailed to their customers; and that Stewart had several times visited the saloon. There was evidence on which the jury might have found that, on at least one occasion when Stewart was at the saloon, he virtually solicited orders from Emerson for liquors. It appeared that Emerson, not long after this, ordered liquors of Stewart by letter, and that the liquors so ordered were delivered by Stewart to a carrier in New York, directed to Emerson at Manchester, N. H., and were received by Emerson.

The plaintiff proposed to ask Stewart: " Did you not understand that the sale of liquor in New Hampshire was prohibited except by town agents?" The question was ruled inadmissible, subject to the plaintiff's exception.

There was evidence tending to show that Stewart, when he solicited orders from and sold liquors to Emerson, had reasonable cause to believe, and did believe, that Emerson intended to re-sell them at his saloon in New Hampshire.

The plaintiff requested the following instructions: 1. That if the liquors were sold with knowledge that they were purchased with a view and intention of a re-sale in this State contrary to our laws, and the liquors were so sold, they would constitute no indebtedness so as to entitle Stewart to impeach the sale as being fraudulent.

2. If the jury believe that Stewart came into this State and solicited Emerson to purchase liquors of him, knowing that if purchased they were to be sold in his saloon contrary to the laws of this State, that no liquors thus sold could constitute an indebtedness to entitle the

defendant to attach on the ground of the sale being invalid as against creditors.

3. If the jury find that Stewart encouraged Emerson to purchase the liquors and sell them in violation of the laws of this State, any liquors thus sold could not make him a creditor in this State.

The instructions asked for were not given, and the plaintiff excepted.

The jury found the plaintiff entitled to recover for a portion of the articles described in his writ, but not for any of the articles which he claimed by purchase from Emerson. (The verdict was in the form agreed on by the parties, to be used in the event of the jury's coming to such a conclusion.)

The plaintiff moved to set aside the verdict by reason of the foregoing exceptions.

*Charles R. Morrison*, for the plaintiff.

We have found no authority to warrant the denial of the 2d and 3d instructions requested. In *Woolsey* v. *Bailey*, 27 N. H. 217, and *Smith* v. *Smith*, 27 N. H. 244, the facts were somewhat similar; but the questions now before the court were not considered, or presented.

Stewart, in coming into this State, and soliciting orders for liquors, knowing that if purchased they were to be again sold in violation of our law, committed an indictable offence against our laws; for the mere *soliciting* another to commit an indictable offence is indictable. Russell on Crimes 46; *Higgins' Case*, 2 East. 5; *The State* v. *Avery*, 7 Conn. 267; *State* v. *Keyes*, 8 Vt. 57; 3 St. Trials 519; 3 Burr. 1438. Exciting, encouraging, and aiding a person to commit a misdemeanor, is itself a misdemeanor. Thus, letting a house to a woman of ill-fame, knowing her to be such, with the intent that it shall be used for purposes of prostitution, is an indictable offence at common law. *Commonwealth* v. *Harrington*, 3 Pick. 26. And *Girardy* v. *Richardson*, 1 Esp. 13, is directly in point to show that there can be no recovery for the use and occupation under such circumstances. See, also, *Beach* v. *Kezar*, 1 N. H. 184. The case in 3 Pick. 26 is also in point, to show that the 3d instruction called for was warranted by the facts; for in that case it is stated that " there was no evidence to prove any express agreement that the house *should* be thus used, but there was evidence that the lessee was a woman of ill-fame, and that the defendant knew it when he let the house;" and that was considered sufficient to sustain an indictment charging that the letting was with the *intent* that the business of prostitution should be carried on in the house. To solicit orders for liquors, knowing that if ordered they are to be sold in violation of law, *is to encourage and solicit a violation of law;* and it does not help the plaintiff that he only sought to make money out of it. An accessory before the fact is one who, though absent at the time of the commission of the felony, doth yet persuade, counsel, command, or abet another to commit such felony. Wharton's Crim. Law 69. And the procurement " may be either by direct means, as by hire, counsel, or command; or indirect, by evincing an

express liking, approbation, or assent to another's felonious designs "—
id. p. 74 ; 2 Hawk ch. 29, § 11 ; *People* v. *Norton*, 8 Cowen 137. In
*Beach* v. *Kezar*, 1 N. H. 184, it was held that the plaintiff could not re-
cover for the keeping of oxen, in the war of 1812, with full information
of their destination, and with an express view to facilitate their pas-
sage to the British troops in Canada, for whom they were intended. If
Stewart had solicited orders for burglars' tools from a professional
burglar, *knowing* that if purchased they were to be used in his calling,
the case would be, in *principle*, in no way different from the case before
the court. Is it supposed that he could recover for the price of his
tools ?

Upon the foregoing principles the case comes directly within the
rule stated in *Bliss* v. *Brainard*, 41 N. H. 268, that "when a contract
*grows immediately out of*, and is connected with, an illegal or immoral
act, a court of justice will not lend its aid to enforce it. So if the con-
tract be, in part only, connected with the illegal consideration, but
growing immediately out of it, though it be in fact a new and separate
contract, it is equally tainted by it." *Territt* v. *Bartlett*, 21 Vt. 184.

The ruling upon the first point is, perhaps, warranted by *Smith* v.
*Godfrey*, 28 N. H. 379 ; but we submit that the instruction asked for
is correct in principle, and sustained by the weight of authority.
*Webster* v. *Munger*, 8 Gray 587 ; *Finch* v. *Mansfield*, 97 Mass. 89 ;
*Lightfoot* v. *Tenant*, 1 Bos. & Pul. 551 ; *Langton* v. *Hughes*, 1 M. & S.
593 ; *M'Kinnell* v. *Robinson*, 3 Mees. & Wels. 434 ; *Cannan* v. *Bryce*, 3
Barn. & Ald. 179 ; *Ruckman* v. *Bryan*, 3 Denio 340 ; *Morgan* v. *Groff*,
5 Denio 364 ; Story's Conflict of Laws, §§ 253–5 ; *Ritchie* v. *Smith*, 6
M. G. & S. 462 ; *Catlin* v. *Bell*, 4 Camp. 183 ; *Chauncey* v. *Yeaton*, 1
N. H. 151 ; *Beach* v. *Kezar*, 1 N. H. 186 ; *Territt* v. *Bartlett*, 21 Vt. 184.
" The man who sold arsenic to one whom he knew intended to poison
his wife with it, would not be allowed to maintain an action on his
contract. The consideration of the contract, in itself good, is there
tainted with turpitude, which destroys the whole merit of it. Other
cases, where the means of transgressing a law are furnished with
knowledge that they are intended to be used for that purpose, will
differ in shade more or less from this strong case, but *the body of the color
is the same in all.* No man ought to furnish another with the means of
transgressing the law, *knowing that he intends to make that use of it.*"
EYRE, Ch. J., 1 Bos. & Pul. 555 ; *Lightfoot* v. *Tenant*, cited and approv-
ed by WOODBURY, J., in 1 N. H. 186. A purchaser is deemed a party
to the fraudulent design of the seller, if he is aware of it. *Robinson* v.
*Holt*, 39 N. H. 559 ; *Everett* v. *Read*, 3 N. H. 55 ; *Seavy* v. *Dearborn*,
19 N. H. 358.

If a sale *in this State*, with knowledge that the property is purchased
with a view and intention of a re-sale contrary to our laws, is illegal,
a sale over the lines should fare no better. Outsiders have no just
claim to be placed upon a *better* footing than our own citizens.
Whether the law to be violated " is that of the country of the vendor,
cannot, as a matter of principle, be material, especially when he is
seeking his remedy in the tribunals of the country whose laws he

knows are to be violated.   No comity requires the enforcement of such a contract."   THOMAS, J., *Webster* v. *Munger*, 8 Gray 586 ;  see, also, *Territt* v. *Bartlett*, 21 Vt. 184 ; *Finch* v. *Mansfield*, before cited ; Story's Conflict of Laws, §§ 253–255 ; *Langton* v. *Hughes*, 1 M. &, S. 593 ;—" If a Guernsey man collude with a person living here to defeat the laws of this country, he shall not call in aid the laws of this country."   GROSE, J., 4 Term R. 468.   " The contract to which aid is required should not, either in itself or in the means used to give it effect, work an injury to the inhabitants of the country where it is attempted to be enforced."   5 Louis. 295 ; Story's Conflict, § 244. Unless the rum traffic should be *wholly unrestricted*, such contracts as the plaintiff seeks to enforce here *do* work a manifest injury to the inhabitants of this State.   " Contracts which are in evasion or fraud of the laws of a country, or the rights or duties of its subjects,—contracts against good morals or against religion, . . .   are deemed nullities in every country- affected by such considerations, although they may be valid by the laws of the place where they are made." 2 Barn. & Cress. 471 ; Story's Conflict, § 244.   The rule here stated has been approved by this court.   28 N. H. 382 ; 41 N. H. 261.

No greater nuisances exist than the hundreds of liquor saloons in our State ; and if sales to supply them with liquor do not fall within the catagory of contracts that will not be enforced here, it will be difficult to find any that do.

*Morrison & Stanley*, for the defendant.

The only question presented in this case is, Was there any indebtedness from Emerson to Stewart, the attaching creditor, under whom the defendant justified ?

The plaintiff maintains that the claim of Stewart being for liquors sold was not a valid indebtedness, and such as the defendant can justify under.   The validity of a contract is to be determined by the law of the place where made.   This is the established doctrine of the courts of this State.   The debt on which the attachment was founded was a debt created in New York, and under the laws of New York was valid and binding.   The goods were sold and delivered in New York ; the sale was complete when they were delivered to the carrier there. *Woolsey* v. *Bailey*, 27 N. H. 217 ; *Smith* v. *Smith*, 27 N. H. 244 ; *Smith* v. *Godfrey*, 28 N. H. 379.

The sale, then, being valid by the laws of New York, is valid and binding here, and constitutes a subsisting indebtedness against Emerson.

But the court were asked to give certain instructions to the jury, and on account of their refusal this case now comes up for decision. The first instruction does not seem to be insisted on, and we do not see why it could be, for the same point was decided in *Smith* v. *Godfrey*, before cited.

Upon the second instruction asked for, the ruling of the court was correct, and is supported by *Finch* v. *Mansfield*, 97 Mass. 89.   There

was no evidence on which the jury could find that Stewart knew there was any law in this State against the sale of liquors, or that he knew they were to be sold in violation of law. That Stewart had some reason to know that the defendant could not lawfully sell them, was not sufficient. It must be proved that he did know it. There is no presumption of law that he knew it. Stewart must have been proved to know that Emerson intended the liquors for sale unlawfully in this State, in order to make the contract illegal if it was made in New York. These positions are fully sustained by *Finch* v. *Mansfield*, before cited. It must be borne in mind that the law of Massachusetts, under which *Finch* v. *Mansfield* was decided, was much stronger than the law in this State; for, by sec. 61 of chap. 86 of Mass. Gen. Statutes, it is expressly provided that no debt can be recovered, no action maintained for liquors or the price of liquors sold in any State, where the vendor has reasonable cause to believe that they are to be sold in violation of law within that State. Counsel have cited numerous authorities in support of their position on the second point, but they seem to us to have no legitimate bearing. They are all cases, so far as we have been able to find, where the contract was void when it was made,—as in *Bliss* v. *Brainard*, where the sale was made in this State, and where the question was whether pay for the casks could be recovered ; and upon that point the court made the remark quoted in the plaintiff's brief.

Numerous cases are cited in the plaintiff's brief in regard to the sale of poisons, and in regard to the violation of the revenue laws, but they do not touch the point at issue—a point which was expressly decided in *Smith* v. *Godfrey* and *Finch* v. *Mansfield*, before cited.

This case, we believe, is to be decided according to the settled law of the land, and not upon appeals and suggestions as to the enormity of "the rum traffic." At all events, we would suggest that such suggestions would have more weight if made in behalf of one whose hands were clean, than if made in behalf of this plaintiff, who comes to this court invoking its aid to help him keep liquors which were legally sold to Emerson, and which he and Emerson, in fraud of the creditors, are attempting to recover in this suit. The writ shows that the property claimed in this suit is, a large share of it, liquors ; and the jury, by their verdict, have found that they were not the property of the plaintiff, but were the property of Emerson, as whose property they were attached by the defendant. If the plaintiff's claim were in no way tainted with "rum" or "the rum traffic," he could come before this court with a better grace, to ask to have the court sustain the positions assumed by the requests for instructions.

*H. & G. A. Bingham*, on the same side.

I. The plaintiff's requests were properly denied, as they submitted to the jury issues not raised by the evidence.

There was no evidence competent to be submitted to the jury as tending to show knowledge in Stewart that the goods were to be *illegally* sold in New Hampshire. *Gassett* v. *Godfrey*, 26 N. H. 415.

The plaintiff's question to Stewart was immaterial so long as it did not appear that Emerson was not a town agent. Knowledge that Emerson intended to re-sell the liquor, was not knowledge that he intended to do it *illegally;* and the burden of showing the illegality was on the plaintiff. *Gassett* v. *Godfrey*, before cited; *Doolittle* v. *Lyman*, 44 N. H. 608.

II. The goods were sold and delivered in New York. It was a valid sale there, and being valid there is valid here. *Banchor* v. *Warren*, 33 N. H. 183; Parsons on Contracts, p. 99, vol. 2; *Fuller* v. *Bean*, 34 N. H. 290.

III. But the plaintiff claims this sale invalid here, notwithstanding its validity in New York.

1st. Because Stewart knew it was to be re-sold in New Hampshire contrary to law.

We submit that such is not the law, but that the rule is that mere knowledge on his part that the goods were to be re-sold here illegally by Emerson, does not affect the validity of the sale, or take away his right to enforce the same in this State. *M'Intyre* v. *Parks*, 3 Met. 207; *Holman* v. *Johnson*, Cowper 341; *Pellecat* v. *Angell*, 2 Crompton, Meeson & Roscoe 311.

This point is expressly decided in this State in *Smith* v. *Godfrey*, 28 N. H. 379, where the case of *Holman* v. *Johnson* is cited with approbation.

2d. Because Stewart came into the State and solicited Emerson to purchase the goods, knowing that they were to be re-sold contrary to law by Emerson at his saloon.

It is hard to see how this request varies the rule of law applicable to the first, and we contend it does not. Stewart made no trade or sale here (*Banchor* v. *Warren*), and solicited him to make none. If he did, the case does not find any such sale made, hence no part of this case. Then the purport of the evidence is, that Stewart, in this State, solicited Emerson to purchase of him in New York, where he could lawfully do so, some liquors. He did not solicit him to re-sell them here contrary to law.

The plaintiff's brief assumes that he did solicit him to re-sell them here contrary to law, which, being untrue, all legal conclusions drawn therefrom have no application.

The fact that talk about the sale was had here does not change the law. *Hodgson* v. *Temple*, 5 Taunton 181, is a case where the entire purchase was made in the country where it was known that the goods were to be applied to an illegal trade. See, also, Reporter's note to *Gross* v. *LaPage*, 1 Holt 105,—3 E. C. L. 43.

The rule would seem to be, that a party claiming the assistance of the law to enforce a contract, must not in that *very* contract have violated the law. And to have violated the law, he must have been a sharer or participator in the *very* illegal contract. Neither of the plaintiff's requests suppose that Stewart sold the goods in this State, nor that it was any part of his sale that they were to be re-sold in this State by Emerson, or that he had any interest in them or control over them af-

ter they were sold and delivered in New York. Hence there is nothing in the contract that the defendant asks to have enforced, that is illegal. And no reason exists why the court should listen to the plaintiff's cry of "stop thief," that he may confiscate the goods.

3d. Because of his third request, to wit, that Stewart encouraged Emerson to purchase the liquors, and sell them in this State contrary to law.

The language of this request might perhaps, the proper facts appearing, be correct; but to the facts in the case at bar it has no application, and was properly refused.

If Stewart had encouraged him to buy, to re-sell the liquors in this State contrary to law, by being a participator and sharer in both the sale and *re-sale*, then, undoubtedly, it would have been illegal; but the evidence does not tend to prove any such encouragement to re-sell the liquor as rendered the original sale illegal.

FOSTER, J. The main question in this case is, whether Stewart, represented here by the defendant, an attaching officer, holding the property of Emerson by virtue of Stewart's attachment, can, as against the plaintiff, claiming title to the same by purchase from Emerson, hold the property thus attached; the object of Stewart's suit and attachment being to recover the price of spirituous liquors sold by him to Emerson, and by Emerson re-sold in violation of our laws;—or, in fewer words, whether, under the circumstances of this case, the court will lend its aid towards the enforcement of Stewart's claim to recover the price of the spirituous liquors thus sold by him.

In order to make a correct application of the principles and rules of law which are to determine this question, it will be necessary to examine with care the peculiar facts of the case.

Stewart was a dealer in spirituous liquors, residing and doing business in the city of New York: Emerson was a retailer of spirituous liquors at his saloon in Manchester. This establishment, in the hands of Emerson and his predecessors in the same business, was well known to Stewart, who had frequently visited the saloon, and of whom Emerson and the preceding proprietors of the saloon had previously bought liquors which were retailed by them to their customers.

There was evidence from which the jury might have found that, on at least one occasion when Stewart was at the saloon, he virtually solicited orders from Emerson for liquors; and there was evidence tending to show that when he solicited such orders, and, subsequently, sold liquors to Emerson, Stewart had reasonable cause to believe, and did believe, that Emerson intended to re-sell them at his saloon in Manchester. Not long after one of these visits, on which occasion he had solicited such orders, Emerson ordered liquors of Stewart by letter (not, however, in pursuance of any previous contract or understanding); and the liquors so ordered were delivered by Stewart to a carrier in New York, directed to Emerson at Manchester, N. H., and were duly received by Emerson.

It does not appear, as matter of fact, that Stewart, when he solic-

ited the orders or sold the liquor, was acquainted with the laws of this State regulating the sale of spirituous liquors; and the court refused to permit the plaintiff to inquire of Stewart whether he did not understand that the sale of liquor in New Hampshire was prohibited except by town agents.

The ruling of the court in this particular was correct. Ignorance of the law would have furnished no excuse to Stewart. Broom's Leg. Maxims 190. Every man is presumed to know the laws of the country in which he dwells, or in which, if residing abroad, he transacts business. A foreigner, trading in or to this country, is bound to take notice of our laws; and a contract made by him in violation of them will not be enforced in our courts. *Cambiosoco* v. *Maffit*, 2 Wash. C. C. 98; 1 Bishop on Criminal Law, § 375.

The plaintiff contends that Stewart, by coming into this State and here soliciting orders for liquors, knowing that, if purchased, they were to be sold by the purchaser in violation of our law, committed an indictable offence; that he was an aider or accessory to the offence of selling the liquors by Emerson; that the contract of sale, upon which Stewart claims as a creditor of Emerson, grows out of and is connected with an immoral and an illegal act, and is therefore not to be protected or enforced by our courts; and that Stewart, therefore, is not, as a creditor of Emerson, entitled to impeach the validity of the alleged sale by Emerson to the plaintiff.

It is an elementary principle that no contract can be enforced, nor any damages recovered, for the breach of a contract or promise which contravenes the principles of the common law, the provisions of a statute, or the general policy of the law. Metcalf on Contracts 221.

And it is well settled in this State, that the consideration agreed to be paid for spirituous liquors sold without license, cannot be recovered. The sale being prohibited by statute, and the vendor being liable to a criminal prosecution for the selling, the traffic is made illegal, and contracts respecting it cannot be enforced. Wherever an indictment can be sustained for the illegal sale, there the price cannot be recovered. *Smith* v. *Godfrey*, 28 N. H. 384, and cases cited; *Plumer* v. *Smith*, 5 N. H. 553; Met. on Contracts 225.

The reasons which lie at the foundation of these well-established principles are suggested by considerations of sound public policy. The public good and not the defendant's advantage is the controlling consideration. *Beach* v. *Kezar*, 1 N. H. 185. For I apprehend the moral instincts of courts and juries would naturally revolt against the encouragement of a defence so mean, impudent, and contemptible.

" The objection," says Lord MANSFIELD, in *Holman* v. *Johnson*, Cowper 348, " that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff; not for the sake of the defendant, but because the court will

not lend their aid to such a plaintiff. So, if the plaintiff and defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis."* The law in such cases leaves the parties where it finds them. Chitty on Contracts 731; *Bayley* v. *Taber,* 5 Mass. 286; *Roby* v. *West,* 4 N. H. 285.

But, generally speaking, the validity of a contract is to be decided by the law of the place where it was made, unless it was agreed, either expressly or by tacit implication, that it should be performed in some other place; and then the general rule is, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance. Story on Conf. of Laws, §§ 242, 280; *U. S. Bank* v. *Donnally,* 8 Pet. 372; *Wilcox* v. *Hunt,* 13 Pet. 379; *Andrews* v. *Pond,* 13 Pet. 65; *Don* v. *Lippman,* 5 Cl. and F. 13; *Fergusson* v. *Fyffe,* 8 Cl. and F. 121. Contracts, valid by the law of the place where they are made, are generally valid everywhere, *jure gentium,* and by tacit consent. 2 Kent's Com. (ed. 1866) 454.

And if, in the place where the contract was made, the policy of the local law would enforce it, it will also be enforced in the jurisdiction to which a party may be compelled to resort for the application of his remedy for a breach of the foreign contract.

This rule, it has been said, is founded not merely in the convenience, but in the necessities of nations and States: for, otherwise, it would be impracticable for them to carry on an extensive intercourse and commerce with each other.

"*Jus autem gentium omni humano generi commune est; nam usu exigente, et humanis necessitatibus."* 1 Inst. Lib. 1, tit. 2, § 2.

Upon the foundation of this doctrine rests the whole system of sales, agencies, credits, and negotiable instruments; " and," says Judge STORY, " no more forcible application can be propounded of this imperial doctrine, than to the subject of international private contracts." Story's Conf. Laws, § 242.

With peculiar cogency does the doctrine apply to the positive necessities of a country like ours, composed of thirty-seven distinct sovereignties, in strictness wholly independent of each others' local laws, but most essentially dependent for their general prosperity upon the deference, respect, and regard for each others' peculiar policy which the comity of nations demands.

But there is an important exception to the rule, consisting in this: that no nation or State is bound to recognize or enforce contracts which the government of such State or nation may deem injurious to its own interests or the welfare of its own people, or which are in fraud and violation of its own laws. Such contracts are considered as nullities in every country affected by such considerations, although they may be valid by the laws of the place where they are made. Story's Conflict of Laws, § 244; *Andrews* v. *Pond,* 13 Pet. 65.

The exception is important, notwithstanding the imperative necessity which lies at the foundation of the rule; for, while the comity of na-

tions and States will always regard with respect and consideration the laws and customs of other communities, still its own interests and the welfare of its own citizens will nevertheless be held by every State in paramount consideration. One of the most difficult questions, therefore, with which the courts of the various States composing the Federal Union have to deal, is precisely that now presented: namely, To what extent will the courts go in sustaining an exception that takes out of the general rule and invalidates a contract sought to be enforced here, which, though entirely legal in the jurisdiction where the contract was made, is regarded, in this State, as contrary to morality or the provisions of our local statute?

Viewed in the light of all these suggestions, the principal question presented is, whether the evidence which shows that Stewart knew or had reasonable cause to believe that Emerson, at the time of the sale to him, intended to transport the liquors into this State, to be here kept and sold in violation of our laws, would constitute a defence, if the present suit were brought by the vendor against the vendee to recover the price of the liquors.

In considering this matter, we are not for a moment to lose sight of, nor to underrate the importance, the imperative necessity for the enforcement of the rule; and we are to admit no given case within the exception, unless by the compulsion of a necessity demanded by local policy or positive law.

It is claimed by the plaintiff that the present case falls within the exception.

The case of *Smith* v. *Godfrey*, before cited, must be regarded as decisive *to a certain extent* of the questions involved in this inquiry; and as fully sustaining the ruling of the judge at the trial term, in refusing to give the *first* branch of the instructions desired by the plaintiff. It is there held that " bare knowledge on the part of the vendor of goods that they are to be sold in another State contrary to the laws of that State, will not make the sale of the same illegal in the State where the sale is not prohibited." It is also there held that the price of goods sold and delivered in a State where such sale is legal, and where nothing remains to be done by the vendor to complete the transaction, and he is not in any way to be further connected with it, may be recovered in this State, where such sale would be illegal. " *Aliter*, if *it be an ingredient in the contract that the goods shall be illegally sold, or that the seller shall do any act to assist or facilitate the illegal sale.*"

In the present case, it is conceded that the sale by Stewart to Emerson was consummated in New York, that the goods were there delivered to Emerson's agent, and that the sale was not in violation of the laws of that State.

The only remaining question then is, whether this case is brought within the exception alluded to, because of the mixture of any ingredient in the original contract of sale providing that the goods should be illegally sold by Emerson, or by any act of Stewart, aiding, assisting, or facilitating the illegal sale in this State. But there is no evi-

dence that the contract of sale between Stewart and Emerson was complicated by any " ingredient" concerning the subsequent disposition of the liquors by Emerson ; and the " act " of assistance or facilitation of a subsequent illegal sale by Emerson was neither more nor less than this : " On at least one occasion when Stewart was at the saloon, he virtually solicited orders from Emerson for liquors," *believing*, at the time, that Emerson intended to re-sell them at his saloon in New Hampshire.

It does not appear, nor is it suggested, that Stewart advised, requested, or encouraged the sale of the liquors by Emerson contrary to law, in any other way than by soliciting him to purchase them ; nor that he had any participation in the re-sale otherwise than by furnishing the liquors to Emerson for a price which does not appear to have been regulated by any consideration relative to the final disposition of the property by Emerson. Stewart's connection with the transaction terminated with his delivery of the goods to the carrier, an agent of Emerson, in New York. It does not even appear that Stewart had any actual knowledge of Emerson's purpose or intentions with regard to the disposition of the liquors.

The authorities bearing more or less directly upon the subject before us, are quite numerous and somewhat conflicting.

Judge METCALF, in his work on Contracts, pp. 260, 261, uses the following language :   " As ' courts will not lend their aid to enforce a contract entered into *with a view* of carrying into effect anything which is prohibited by law,' they will not allow a party who sells goods, *knowing* that the buyer is to use them in contravention of a statute, to recover the price.   Thus, where an Englishman in Guernsey sold goods *and assisted in packing them in a particular manner* for the purpose of their being smuggled into England, it was held that the seller could not recover pay for them. *Biggs* v. *Lawrence*, 3 T. R. 454. And the same doctrine was applied where the seller was a foreigner, who sued on a bill of exchange given for goods which *he had assisted in smuggling* into England. He could not resort to the laws of England, which he had assisted to evade. *Clugas* v. *Penalula*, 4 T. R. 466 ; *Waymell* v. *Reed*, 5 T. R. 599. Where an English merchant chartered a vessel of a merchant in New York, while the non-intercourse laws of the United States were in force, for the purpose of conveying a cargo from New York to Fayal, to be transported thence to England, it was held that he could not maintain an action in this country for the hire of the vessel. *Graves* v. *Delaplaine*, 14 Johns. 146."

The learned author then cites, with apparent disapproval, the antecedent case of *Holman* v. *Johnson*, Cowp. 341, where the contract and delivery of goods were complete abroad, and the vendor, a foreigner, *did no act* to assist the smuggling of them ; and he was held entitled to recover pay for them in England, though he *knew* that they were to be smuggled. " This case," he says, " can be reconciled with the subsequent decisions only on the ground that a foreigner is not bound to *guard* the revenue laws of England, though he cannot actively assist

in violating them." And he continues as follows—" Though MANS-
FIELD, C. J., in *Hodgson* v. *Temple*, 5 Taunt. 181, said, 'the merely sell-
ing goods, knowing that the buyer will make an illegal use of them, is
not sufficient to deprive the vendor of the price, &c. ; *he should share in
the illegal transaction ;'* yet that point was not necessarily involved in
the decision ; and in *Lightfoot* v. *Tenant*, 1 Bos. & Pul. 551, it was de-
cided that a person selling goods *in order that* they might be exported
to a place where, by statute, they could not be exported legally, could
not recover, even on a bond given for the price of them." He also
cites in support of his position *Langton* v. *Hughes*, 1 M. & S. 593 ; and
*Cannan* v. *Bryce*, 3 B. & Ald. 179, in which ABBOTT, C. J., is reported
as inquiring—" if it be unlawful for one man to *pay* [for settling
losses on illegal stock-jobbing transactions], how can it be lawful for
another to furnish him with the means of payment ?"—and various
other cases which, he thinks, tend to the same result. He concludes
that Lord ERSKINE, in *ex-parte Bulmer*, 13 Ves. 353, is at variance
with the King's Bench, in *ex-parte Bell*, 1 M. & S. 751, and that Lord
ERSKINE's doctrine is not recognized as the law of England.

It is manifest that if Judge METCALF's deductions from the cases
cited by him are correct and sustain the view which he adopts, those
cases are not in accordance with the view of the law entertained by this
court in *Smith* v. *Godfrey*. We shall advert to some of these cases
again presently.

And it is manifest that Judge METCALF makes no distinction between
a case of bare knowledge of illegal intent on the part of the vendee,
and an active participation and assistance in the performance of the
illegal intent :—between the act of putting into the party's possession
the means of doing an unlawful act with the belief that such unlawful
act will be done, and the furtherance of that unlawful act by actively
aiding its accomplishment.

In *Gaylord* v. *Soragen*, 32 Vt. 110, the plaintiff, residing in New
York, and being authorized to sell spirituous liquors there, sold some
there to the defendant, who resided in Vermont, where the sale of such
liquors was unlawful, the plaintiff, at the time of the sale, knowing
that the defendant intended to sell them in Vermont contrary to law.
The liquors were delivered in New York to a carrier designated by the
defendant, to be transported to Vermont at the risk of the latter.
But, at the defendant's request, and to prevent the seizure of the
liquors in Vermont, the plaintiff *marked the casks in a peculiar way*,
omitting the defendant's name.

In delivering the opinion of the court, ALDIS, J., said, " Although
mere *knowledge* of the unlawful intent of the vendee by the vendor
will not bar him from enforcing his contract to recover for the goods in.
our courts, yet it is well settled that if he in any way aid the vendee
in his unlawful design to violate our laws, such participation in the ille-
gal enterprise will disqualify him from maintaining an action on his
contract in this State. The participation by the vendor must be active:
to some extent ; he must do something, though indirectly, in further-
ance of the vendee's design to violate our laws. Mere omission to act

is not enough, but positive acts in aid of the unlawful purpose, however slight, are sufficient.

"The omission to mark the casks with the defendant's name, standing alone, would not in our judgment be an act of participation sufficient to bar the plaintiff. But the plaintiff went further; and the act done, though slight, is significant. He so marked them that 'the defendant might instantly know his casks on their arrival, and so be enabled to remove them before the officers of the State should have their suspicions awakened. This act, though so slight, gave the defendant an advantage over the officers, and aided him in escaping their vigilance. This was the object the plaintiff and the defendant intended to accomplish by having them so marked. We think the act done tended to secure their design. As the evidence tended to prove that the plaintiff, *by his acts done in connection with the sale and delivery of the liquors, aided the defendant* to escape the vigilance of the officers, and so to have and sell the liquors in violation of law, it should have been admitted."

The decision of this case, then, is put clearly upon the ground of an active participation by the plaintiff in the unlawful act of the vendee,— passive knowledge of intention being regarded as wholly insufficient to affect the validity of the contract. Notwithstanding full knowledge of the unlawful intent of the vendee, there must be something else actively done by him. "Mere omission to act is not enough."

In *Aiken* v. *Blaisdell*, 41 Vt. 656, the evidence tended to show that, at the time of the sale of the liquors, the plaintiff was informed by the defendant of the existence of the prohibitory law of Vermont; and that the defendant was purchasing the liquor for the purpose of selling it in violation of the law; and that he could not have the liquor come all at once to him, or have it directed to him openly, without risk of seizure ; and that the plaintiff agreed to send the liquor to him in a disguised form, so as to avoid seizure ; and, in pursuance of said agreement, he did so send it.

The court, PIERPOINT, C. J., expressly affirms the doctrine of *Gaylord* v. *Soragen*, that mere knowledge of the defendant's unlawful intent will not bar the plaintiff's right of action, but some active participation in the fraud will be required ; and the decision of the case against the claim of the plaintiff is placed upon the ground that such act of the plaintiff is a positive participation in the defendant's guilt, and that it avoids the previous contract of sale ; because it is not a separate transaction disconnected from the original contract, but immediately and directly connected with it, being done in the act of carrying out and executing the contract, by forwarding and delivering the property as required by that contract.

In this connection see Story on Contracts, § 625, and *Territt* v. *Bartlett*, 21 Vt. 184.

In *M'Intyre* v. *Parks*, 3 Met. 207, it was held that a sale made in another State and valid by the law of that State, will not be held void in Massachusetts, from the bare fact of the knowledge or belief of the vendor, of the purchaser's intent to re-sell in Massachusetts in violation of law.

In commenting upon this case, THOMAS, J., in *Webster* v. *Munger*, 8 Gray 587, expresses his disapprobation of the rule as there laid down : " In my judgment," he says, " it was not rightly decided ;" and he claims that if the rule *be* correct it should not be extended. " The case at bar," he says *( Webster* v. *Munger*, much relied upon by the plaintiff here), " does not fall within the rule. The distinction is sound between a case where a seller simply has knowledge of the illegal design,—no more,—and where, having such knowledge, he makes a sale *with a view* to such design, and for the purpose of enabling the purchaser to effect it." " In the case before us," he continues, " the plaintiff was a citizen of and residing in this commonwealth. The evidence shows his knowledge of the illegal business in which the defendant was engaged. One of the orders was taken by the plaintiff at the domicil of the defendant in this State. *In one of the written orders, the illegal purpose for which the liquor was wanted, and the time when it would be wanted for that purpose, were indicated, and the plaintiff was urged not to fail in forwarding it, for that end.* It was on this posture of the evidence that the jury were instructed : ' 1st. That if the contract of sale was made in Hartford, where it was a legal transaction, the plaintiff could recover, unless for the reasons stated in the further instructions of the court, which were,—2dly. That if the sales were made in Hartford, by the plaintiff to the defendant, with a knowledge on the part of the plaintiff that the liquors were to be re-sold in this commonwealth contrary to law, or if, when the plaintiff sold the liquors, he had reasonable cause to believe that they were to be re-sold by the defendant contrary to the laws of this commonwealth, AND the sales were made by the plaintiff *with a view to such re-sale,* then, or in either of these cases, the plaintiff cannot maintain this action.' Under these instructions, to have found a verdict for the defendant, the jury must have been satisfied, *not merely that the plaintiff had knowledge of the illegal purpose of the defendant, but that he sold with reference to it, and for the purpose of enabling him to effect it.* In this view, the instructions are thoroughly sound in principle, and do not conflict with the cases decided." I am unable to regard this case as an authority in support of the position for which it is cited ; but it seems to me of no little importance in its tendency towards the opposite direction.

In *Finch* v. *Mansfield*, 97 Mass. 89, the order for the liquors, the price of which was the consideration of the promissory notes in suit, was solicited from the defendant, at his place of residence, by the plaintiffs' agent, who was a citizen of Connecticut, as were also his principals. The order was transmitted by the agent to the plaintiffs in Connecticut, who filled it there, and forwarded the goods to the defendant in Massachusetts, who paid the freight in pursuance of his understanding with the agent. The price of the goods was agreed upon between the agent and the defendant at the time of the order. On a previous occasion, the agent had, in like manner, solicited from the defendant and forwarded to the plaintiffs a like order, which was, in like manner, filled by them, and was paid by the defendant to the agent. It was *held* that the judge rightly refused to rule, on these facts, that the sale

was made in Massachusetts, and submitted to the jury to determine the place of sale, with instructions that if the agent merely solicited from the defendant the order and forwarded it to the plaintiffs in Connecticut, who thereupon filled it, and delivered the goods to a common carrier, directed to the defendant in Massachusetts, the sale was made in Connecticut.

The peculiar law of Massachusetts, applicable to the case, was not alluded to by counsel or the court ; but it manifestly controlled the decision in this, as in the preceding case of _Webster_ v. _Munger._

The General Statutes of Massachusetts, ch. 86, § 1, provide that " no action of any kind shall be had or maintained in any court, for the price of any liquor sold in any other State for the purpose of being brought into this commonwealth, to be here kept or sold in violation of law, _under such circumstances that the vendor would have reasonable cause to believe that the purchaser entertained such illegal purpose._" It was undoubtedly in view of this statute, and not of any independent principle of the common law, that HOAR, J., used this language :— " The plaintiffs, who were traders in Connecticut, might lawfully sell the liquors there, _unless they knew_ that they were intended to be used in violation of the laws of Massachusetts."

But finally, this provision of the General Statutes in Massachusetts was repealed ; and thereupon the courts proceeded to expound again the doctrines of the common law upon this subject ; and COLT, J., delivering the opinion of the court in _Adams_ v. _Coulliard_, 102 Mass. 167, said, " The verdict of the jury, in this case, establishes the facts, that the liquors, the price of which the plaintiff seeks to recover, were sold to the defendant in New York ; and that the plaintiff had reasonable cause to believe, but had no knowledge, that they were to be brought into this State for the purpose of being sold here in violation of law.

" The action was commenced May 25, 1868. Under the Gen. Stats., ch. 86, § 61, it could not have been maintained. The statute affects the remedy, and was repealed by the Stat. of 1868, ch. 141, before this suit was commenced. The cause of action still remained, and it arose out of a contract valid by the laws of the place where it was made. It is claimed, on the part of the defendant, that the contract originated in the purpose to violate a known law of this State ; and that our courts will not lend their aid, and afford a remedy thereon, even after the repeal of such law. To do this, it is said, would violate an elementary principle of the common law. The illegality of the contract must be determined by the law as it existed at the time the contract was entered into. If then illegal at the place where the contract is sought to be enforced, the rule applies.

" It is not necessary, here, to consider whether the general rule has any modifications, when applied to contracts made out of the State, or to contracts made solely with reference to a violation of the revenue laws. In order to make the plaintiff, under any circumstances, a participant in such unlawful sale, at common law, it is necessary that he should, at least, have knowledge of the unlawful purpose. In some early cases it was held that mere knowledge of the unlawful purpose of

the buyer, on the part of the seller, without further act, where the illegal use to be made of the goods was no inducement in the mind of the seller, would not vitiate the sale so as to deprive the seller of his remedy.　Clearly it is not enough, if he has only reasonable cause to believe that a violation of law is intended.　The statute alone introduces this element, and upon its repeal the rule at common law only applies."

With much deference, I am constrained to say that the distinction suggested in the foregoing remarks between *mere knowledge* and *mere reasonable cause of belief*, seems to me thin and shadowy.

However this may be, the case of *Adams* v. *Coulliard* is precisely the case we are now considering, and is an express authority to the point that, at common law, and independent of statutory provisions, reasonable cause of belief on the part of the seller of goods that the purchaser buys for the purpose of carrying them into another State to be there re-sold in violation of law, does not invalidate the sale.

I propose now to revert to the cases already spoken of which are collected and commented upon by Judge METCALF in his work on Contracts 260, 261.　The leading case in England is that of *Holman* v. *Johnson*, Cowp. 341, where the plaintiff, residing at Dunkirk, had sold the defendant a quantity of tea, knowing that the latter intended to smuggle it into England, but had himself no concern in the smuggling, and merely sold the tea to the defendant as he would have sold to any other person, in the ordinary course of trade.　The action was brought for the price of the tea ; and it was held that the plaintiff could recover.　Lord MANSFIELD, in delivering the opinion of the court, used the following language : " Is there any law of England transgressed by a person making a complete sale of a parcel of goods at Dunkirk and giving credit for them ?　The contract is *complete*, and nothing is left to be done.　The seller indeed knows what the buyer is going to do with the goods, *but has no concern in the transaction itself.* It is not a bargain to be paid in case the vendee should succeed in landing the goods, but the interest of the vendor is totally at an end, and his contract complete, by the delivery of the goods at Dunkirk."

The reasoning of this case rests entirely upon the fact that the contract of sale had no reference to or connection with the subsequent disposition of the goods ; that mere knowledge of the unlawful intent does not make the vendor a participator in the guilt of the purchaser.

Such also is the principle recognized in *Faikney* v. *Reynous*, 4 Burr. 2069.　Lord MANSFIELD, who delivered the opinion in this case also, says " the seller indeed *knows* what the buyer is going to do with the goods, but *the interest of the vendor is totally at an end, and his contract complete by the delivery of the goods.*"

*Biggs* v. *Lawrence,* 3 Term R. 454 ; *Clugas* v. *Penaluna,* 4 Term R.466 ; and *Waymell* v. *Reed,* 5 Term R. 599, were all cases in which the plaintiff sold the goods with knowledge that the purchaser intended to smuggle them ; and in each case the plaintiff was nonsuited ;—but they all differed from *Holman* v. *Johnson* in this, that in each of these cases, in addition to knowledge of the purchaser's criminal intent, the plaintiff did some act in aid of and to facilitate the smuggling of the goods.

Such additional act, in direct furtherance of the purchaser's guilty design, was held to make the plaintiff *particeps criminis.*

In *Waymell* v. *Reed*, BULLER, J., says, "In *Holman* v. *Johnson* the seller did not assist the buyer in the smuggling. He merely sold the goods in the common and ordinary course of trade; but this case does not rest merely on the circumstance of the plaintiff's *knowledge* of the use intended to be made of the goods; for he actually *assisted* the defendants in the act of smuggling, by packing the goods up in a manner most convenient for that purpose."

In *Pellecat* v. *Angell*, 2 Crompt. Mees. & Ros. 311, the court held that the plaintiff could recover the price of the goods, notwithstanding his knowledge, at the time of the sale, that the goods were intended to be smuggled into England;—Lord ABINGER said: "*The distinction is, where he takes an actual part in the illegal adventure;* as, in packing the goods in prohibited parcels or otherwise, there he must take the consequences of his own act." Again, he says, "The plaintiff sold the goods: the defendant might smuggle them if he liked, or he might change his mind the next day: *it does not at all import a contract of which the smuggling was an essential part.*"

In the same case, ALDERSON, B., says, "If the plea disclosed circumstances from which it followed that permitting the plaintiff to recover would be permitting him to receive the fruits of an illegal act, the argument for the defendant would be right; but that ground fails, because the mere sale to a party, although he may intend to commit an illegal act, is no breach of the law."

In *Hodgson* v. *Temple*, 5 Taunt. 181, the plaintiffs were distillers, and sold the liquors to the defendants with full knowledge of their intention to retail them contrary to law. In an action to recover the price of the liquors, the defendants insisted that the plaintiff's recovery was barred because they were *participes criminis.* But MANSFIELD, C. J., said, "This would be carrying the law much farther than it has ever yet been carried. The merely selling goods knowing that the buyer will make an illegal use of them, is not sufficient to deprive the vendor of his just right of payment; but to effect that, *it is necessary that the vendor should be a sharer in the illegal transaction.*"

The case of *Lightfoot* v. *Tenant*, 1 Bos. & Pul. 551, is relied upon by counsel for the plaintiff, here, as being diametrically opposed to the doctrine of these other English cases, and also to that of *Cannan* v. *Bryce*, 3 Barn. & Ald. 179; *M'Kinnell* v. *Robinson*, 3 Mees. & Wels. 434; *Peck* v. *Briggs*, 3 Denio 107; and *White* v. *Buss*, 3 Cush. 448, and as sustaining the position that mere knowledge of the purchaser's intention to make an unlawful use of the goods is sufficient to make the vendor of such goods *particeps criminis* with the purchaser.

But SELDEN, J., in *Tracy* v. *Talmage*, 14 N. Y. 173, contends that when the precise ground upon which these cases were decided is considered, they will be found not in conflict with *Faikney* v. *Reynous* and *Holman* v. *Johnson*, but to support rather than to detract from the doctrine advanced in these cases. "That ground," he says, "is this: that it was the express object of the plaintiffs in these cases *(Tenant* v.

*Lightfoot*, and others of that class), in selling the goods or lending the money, that they should be used for an unlawful purpose, and that such purpose entered into and formed a part of the contract of sale or loan."

A reference to *Lightfoot* v. *Tenant* confirms this view very clearly. The action was upon a bond given for goods sold. The defendant pleaded that the plaintiff sold the goods " *in order that* " they should be shipped without license, in violation of law. The issue being found for the defendant, upon a motion for judgment *non obstante*, EYRE, C. J., contended that " the jury having found that the plaintiff having sold the goods ' in order that ' they should be shipped, &c., it cannot be said that he had no interest in their future destination ; that he may be supposed to have sold the goods for an enhanced price, relying upon the profits to be realized from the illicit trade, for payment." See his extended remarks, 1 Bos. and Pul. 555, 556. And he says again (p. 557), " The jury having found for the plea, the court cannot say that the plaintiff had nothing to do with the future destination of the goods, unless it was impossible to state a case in which they could have anything to do with it."

A critical examination of this case must lead, we think, to the conclusion that it is decided upon the consideration that some advantage to the vendor from the future illegal use of the goods was an essential ingredient in the original contract of sale.

And with reference to *Lightfoot* v. *Tenant*, *Cannan* v. *Bryce*, *M'Kinnel* v. *Robinson*, *Peck* v. *Briggs*, *White* v. *Buss*, and a few others of kindred character, COMSTOCK, J., in his opinion, delivered after a re-argument of *Tracy* v. *Talmage*, says : " I group these cases together because they do not differ essentially in principle. Some of them sustain the position that if the vendor of goods or the lender of money can be connected in intention with the illegal purpose to which the goods or money is to be applied, it is enough to defeat this action, although the unlawful use is not specified in the contract, and although he does no act in furtherance of the design beyond the sale or loan. But further than this they do not go.

" There is certainly room for a distinction between a case where the seller or lender simply knows of the illegal design, and one where he advances the money or the goods for the express purpose of enabling the other party to effectuate such design. For illustration: money may be lent in a gambling house, for the specific purpose of staking it on the result of a game : the law says it cannot be recovered. But suppose a broker or a banker lends money in his office, in the regular course of his business, knowing his customer to be a gambler by habit, and believing that he wants the loan for gaming purposes : if the illegal design does not enter at all into the negotiation of the contract, if it forms no part of the inducement to the transaction, will the knowledge or belief of the lender (and knowledge and belief, for the purposes of this question, are the same) prevent him from recovering the money when it is due ? Such a doctrine, I apprehend, would be highly inconvenient in a commercial community. It would exact a more frequent scrutiny, on the part of dealers, into the habits and designs of

others than the law requires any man to make." And so it was held, in *McGavock* v. *Puryear*, 6 Coldw. (Tenn.) 34, that the mere knowledge, on the part of the lender of money, that the borrower intends making an illegal use of the money, is not sufficient to fix the stain of illegality upon the transaction. To do this it must appear that the lender made the loan, on his part, to procure the doing of the illegal act.

*Beach* v. *Kezar* belongs to the same class of cases. It was assumpsit for keeping oxen for the defendant at Canaan in the year 1813 ;— one ground of defence was, that the cattle belonged to one Bailey, who, from the commencement of the war till the time of the purchase, had resided in Canada, and been employed in procuring beef for the enemy's troops ; that he had made Canaan a rendezvous for the cattle obtained in the United States, and when opportunity offered drove them across the lines ; that the plaintiff knew all these circumstances, and kept the oxen, with full information of their destination, *and with an express view to facilitate their passage to the British troops.* WOOD-BURY, J., places the decision of the court, in favor of the defendant, most clearly upon the ground, not of the plaintiff's mere knowledge of the defendant's illegal intent, but that the plaintiff took an active part in the illegal transaction, and that the services performed in tending the cattle were furnished " with an express design to facilitate their passage over the lines, by keeping them *on the plaintiff's farm in the vicinity of the frontier till Bailey could call for them with safety.*" The case furnishes no intimation of a similar result if the cattle had been kept at such a place and in such a way that nothing relating to their subsequent destination and disposition had entered into and become an inducement to and a part of the original contract for their support and keeping.

The case of the *Commonwealth* v. *Harrington*, 3 Pick. 26, to which the plaintiff's counsel has called our attention, is a case where the letting of a house of ill fame, with the intent of the lessor that it shall be used for purposes of prostitution, is holden to be an indictable offence. No question of contract is raised by the case, and it has no application here, other than such as all those cases have in which the actual intent and design of the party claiming for the price or hire of the thing sold or leased enters into the illegal design and accomplishment of the lessee or purchaser.

In *Bowry* v. *Bennett*, 1 Camp. N. P. 348, where the action was brought to recover the price of clothes sold to the defendant, and the defence was that the defendant was a woman of the town, that this was well known to the plaintiff, and that the clothes were purchased to enable the defendant to carry on the business of prostitution, Lord EL-LENBOROUGH said : "It must be shown, not only that the plaintiff had notice, but that he expected to be paid from the profits of the defendant's prostitution, *and that he sold the clothes to enable her to carry it on*, so that he might appear to have done something in furtherance of it." See cases cited in note (pp. 249, 250). See also *Cheney* v. *Duke*, 10 Gill & Johns. 11, and *Webster* v. *Munger*, before cited.

I am aware of the comparatively recent case of *Pearce* v. *Brooks*, L. R. 1 Ex. 212, decided in 1866. In that case, the plaintiff had supplied a brougham to a prostitute; and it was held, on the authority of *Cannan* v. *Bryce*, that the knowledge that the woman was a prostitute being proven, the jury were authorized in inferring that the plaintiff also knew the purpose for which she wanted an ornamental brougham, and that this knowledge was sufficient to render the contract void. But *Cannan* v. *Bryce* is clearly distinguishable from this, and will not support the latter case; for, says ABBOTT, C. J., in *Cannan* v. *Bryce*, "It will be recollected that I am speaking of a case wherein the means were furnished, with a full knowledge of the object to which they were to be applied, *and for the express purpose of accomplishing that object.*" Is there no valid distinction? In *Cannan* v. *Bryce* the money was loaned *for the purpose* of enabling the party to engage in illegal stock jobbing transactions. If the money had simply been loaned to a person who, the lender knew, was engaged in such transactions, and would probably use the money for such purposes, would the contract be invalid? Money loaned to a gambler, for the purpose of being staked upon a pending game, cannot be recovered. Is it the same of money lent to one known to be a gambler, but concerning which loan and the unlawful game there is no other connection between the parties than that which results from a simple borrowing and lending of money?

So a sale of silks and jewels to a prostitute, if it be clearly shown that such sale was made *for the express purpose* of rendering her person attractive and seductive, and with the view of aiding her unlawful commerce, would be an illegal sale; but shall the seller of such merchandise be disabled from recovery merely *because he knows the buyer to be a prostitute?* Is such mere knowledge sufficient to render the contract void? We cannot believe that public policy requires the exercise of so much scrutiny into the designs of the purchaser, and the imposition of such restraints upon ordinary traffic, as the rule, so broadly stated in *Pearce* v. *Brooks*, would seem to imply; and directly contrary to such doctrine are the express decisions in *Bowry* v. *Bennett*, 1 Camp. 348, *Appleton* v. *Campbell*, 2 C. & P. 347, and *Hodgson* v. *Temple*, before cited.

Moreover, we must not lose sight of the foreign element which distinguishes the present case from that of *Pearce* v. *Brooks*, and those upon which the latter is predicated; for, in so doing, we should become unmindful of the great principle controlling the very question at issue here, namely, the comity which affects the question of the validity of foreign contracts—a principle which may very properly, in some cases, require the enforcement of a foreign contract, such as would not be regarded as valid if made by our own citizens at home, under a different policy from that prevailing in the place where the contract was made. Take the common, the invariable, practice of the recognition and enforcement by the courts of every State in the union, of the laws of any and every other State concerning the rate of interest, as an example. Although a contract made in this State for the payment of eight or ten per cent. interest for the loan of money would be re-

garded as usurious, unconscionable, corrupt, contrary to public policy, and void, still our courts would not hesitate to enforce the same contract if made in Alabama, or Florida, or California. BELLOWS, J., *Townsend* v. *Riley*, 46 N. H. 310–313.

This court will and ought to be reluctant to enforce contracts manifestly against public policy ; but where the public policy of the country is not uniform, but different in neighboring localities and variable in all, it would seem to be assuming rather too much to hold and insist that our own notions of public policy are and must be infallible, to the exclusion of the opinions and views of other enlightened communities and the subversion of commercial comity.

Said Mr. Chief Justice BEST, in *Richardson* v. *Mellish*, 2 Bing. 242, " I am not much disposed to yield to arguments of public policy. I think the courts of Westminster Hall (speaking with deference, as an humble individual like myself ought to speak of the judgments of those who have gone before me) have gone much further than they were warranted in going, on questions of policy."

BURROUGHS, J., joined in the protest of the chief justice " against arguing too strongly upon public policy ; it is a very unruly horse, and when once you get astride it, you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail."

In *Hilton* v. *Eckersley*, 24 L. J., Q. B. 353, 6 E. & B. 47, the judges differed in opinion as to what public policy really was in the case before them ; and Lord CAMPBELL said, " I enter upon such considerations with much reluctance and with great apprehension, when I think how different generations of judges, and different judges of the same generation, have differed in opinion upon questions of political economy and other topics connected with the adjudication of such cases ; and I cannot help thinking that, when there is no illegality in bonds and other instruments at common law, it would have been better that our courts of justice had been required to give effect to them, unless where they are avoided by act of parliament."

To return from this digression : the case of *Tracy* v. *Talmage*, before cited, was considered with very great care. The opinion of the court of appeals, as expressed by SELDEN, J., was evidently pronounced not until after a most elaborate examination of the whole subject ; but, it being subsequently suggested that " the court, through a misapprehension of the authorities cited in the opinion of Judge SELDEN, had fallen into manifest error in its decision," the case was re-argued, and the opinion of the court affirming the prior decision was afterward given by COMSTOCK, J. It is apparent that no pains were spared to make this final examination of the case exhaustive and complete. The very able argument of counsel and the opinion of the court are both reported at length in 14 N. Y. 162–218.

It is there insisted by both SELDEN and COMSTOCK, J. J., and we think conclusively shown, contrary to the suggestion of Judge METCALF, before referred to, that neither the place of residence of the original vendor, nor any peculiarity growing out of the matter of the rev-

enue laws, as connected with the cases, furnishes the foundation for the
principle applied in the class of cases of which *Holman* v. *Johnson* may
be regarded as the leader ; but that that class of cases, like the others,
is governed by the same principle, not irreconcilable, but pervading
the whole current of the authorities, namely, that the validity of the
plaintiff's claim to recover the price of goods sold, with knowledge
that the purchaser intends to make an illegal use of them, depends
upon the circumstance whether or not the original vendor participated
actively, to a greater or less extent, in the subsequent unlawful dispo-
sition of the goods, or whether the expectation of advantage to him,
growing out of the unlawful disposition of the goods by the purchaser,
entered into and constituted a part of the inducement and considera-
tion of the original sale.

*Tracy* v. *Talmage* was a case where the vendor of stocks to a bank-
ing corporation, by the contract of sale, agreed to and did receive
therefor, notes, payable on time, which the corporation was not author-
ized to make, and from issuing which it was prohibited under a penalty
by statute.    Judge SELDEN, after an elaborate review of the authorities,
used the following language : " I consider it, therefore, as entirely set-
tled by the authorities to which I have referred, that it is no defence
to an action brought to recover the price of goods sold, that the vendor
knew that they were bought for an illegal purpose, provided it is not made
a part of the contract that they shall be used for that purpose ; and
provided, also, that the vendor has done nothing in aid or furtherance
of the unlawful design."

There can be no doubt that the plaintiff's general proposition is
sound—that the mere *soliciting* another to commit an indictable offence
is itself indictable,—*The State* v. *Avery*, 7 Conn. 267 ; and also that the
inciting, encouraging, and aiding another to commit a misdemeanor is
itself a misdemeanor,—Russ. on Crimes 46, 47 ; but it is one thing to so-
licit a person to *buy* liquors in the ordinary course of lawful trade, and
another and very different thing to solicit him to *sell* them in violation
of law; see *Finch* v. *Mansfield*, before cited.    And it is one thing to
furnish a person, by means of a lawful sale and purchase, with articles
which the purchaser *may*, and probably will, apply to an improper use,
and another and very different thing to incite, aid, and encourage the
purchaser in committing an offence against law, with or by means of
the property which he *may* use for lawful and proper purposes.

It is not spirituous liquors only, but innumerable kinds of merchan-
dise, which *may* be applied to improper and unlawful uses.    And it
would be wholly impracticable, as well as unwise and unjust (because
restraining to an unreasonable extent the trade and commerce of the
country), to require the vendor of all sorts of merchantable goods to
scrutinize the plans and purposes of the purchaser with regard to the
use of the commodity, and to sell only at the peril of forfeiting the
price in every case where a jury might find, that the seller had reason
to suppose the purchaser intended to make an improper or unlawful
use of the article.

Considerations of local policy, of good morals, of the safety of soci-

ety, and the protection of our own citizens are not to be disregarded; but they are to control and make subservient the interests of commerce and the comity of States, only when these considerations are of unquestionable preëminence. The requirement of what is too loosely termed public policy must be imperative, admitting of no doubt. Till such be the acknowledged case, the reason, logic, precedent, and authority of the law must supersede and ignore any mere system of moral principles, however pure and attractive, or however efficient in the abstract it may seem, for the proper regulation of the actions and manners of men.

Tried by the principles of a code of ethics merely, or by rules of law subjected to such principles, it would be perilous, for example, for a man to furnish, on credit, an unscrupulous horse-jockey, or the dealer in almost innumerable varieties of deleterious patent medicines and nostrums, with the *means* of imposing upon, cheating, and harming unskilled and credulous people.

But we may illustrate the practical application of the principle for which the plaintiff contends, by reference to a great variety of penal statutes regulating and restraining sales of commodities in this State.

Take this example: It is provided by law that "all soft biscuit offered for sale by any baker or other person shall weigh either four or eight ounces each; and all loaves of soft bread shall be of the weight of half a pound, one, two, three, or four pounds; and every loaf or biscuit shall be marked with the weight thereof," &c. And if any baker or other person shall offer for sale any soft biscuit or loaf which does not in weight conform to this requirement, he shall, for each offence, forfeit ten dollars.

A wholesale dealer in flour has frequently visited his customer's bakery, and observed the sale of light and unstamped loaves, and, on one occasion at least, when at the bakery, has virtually solicited orders for flour; and at the time of such solicitation he has reasonable cause to believe that his purchaser will make small biscuits and omit the stamps;—such orders being subsequently filled, is there any principle of law so strict and scrupulous as to forbid the recovery of the price of the flour?

Shall not the farmer recover the price of milk which he solicits the retail milk-peddler to purchase of him, if it appear that he has reasonable cause to believe the peddler's customers too often get short measure, or measure long enough only because attenuated by dilution?

Shall the farmer be required to forfeit the price of the hay which he has sold to another for pressing or exportation, because he may have reasonable cause to believe the latter will evade the law which is intended to regulate the pressing and branding of hay?

And what would we think of a judicial decision which should prohibit recovery of the price of the enormous quantities of corn, rye, potatoes, and malt, which find their way from the granaries of the Middle and Western States into those distilleries of whiskey, far more numerous and extensive than public policy and the safety and welfare of the people require?

The case is supposed of burglars' tools, poison, &c., purchased with the knowledge by the vendor that the articles were intended for criminal use; and it is said that this is a fair illustration of the principle; or that, although the cases supposed may differ in shade from the case now before the court, still, in the language of EYRE, C. J., in *Lightfoot* v. *Tenant*, " the body of the color is the same in all."

We are not inclined to adopt, without qualification, the reasoning of that case, or the conclusion to which it tends. We think that a person who sells the ordinary subjects of mercantile trade, and, as is almost universally the usage of the mercantile community, invites, solicits, and urges custom in his line of business, is not to be identified with the unlawful subsequent use of the articles sold, and subjected to the consequences of prosecution as an accessory or *particeps criminis* in the unlawful subsequent sale, merely because he is not shown to have exercised extreme scrutiny and caution with regard to the ultimate destination and use of the goods purchased.

We are inclined, instead, to accept the reasoning of Mr. Justice COMSTOCK with regard to this matter. " The case," he says, " may be put of poison or a deadly weapon purchased for the purpose of murder. The offence intended may be of such enormity that no man having a knowledge of the design can remain neutral, without being, in a just sense, a criminal himself. Where the design is to violate the fundamental laws of society, a positive duty of intervention may arise to prevent the perpetration of the crime. To such cases the rule which we lay down ought not to be applied. But if the question should ever be thoroughly examined, it will, I think, be found to have been far too broadly asserted, in respect to illegal contracts, that the law does not distinguish between acts criminal in their essential nature, and those which are wrong only because they are prohibited. This distinction cannot be made where the contract itself is prohibited, and the question is directly upon its validity. The inquiry then depends not so much upon the ethics as the logic of the law, which cannot both affirm and prohibit the same contract. But in respect to many incidental questions, the moral feeling and common sense of every man does discriminate, and so, I apprehend, does the law." 14 Johns. 215.

We do not deem it necessary, however, to base our conclusions, in this case, upon the distinction alluded to by Mr. Justice COMSTOCK; and we wish it distinctly understood that although " the moral feeling and common sense of every man does discriminate," yet we do understand that there is no valid distinction in the application of the law upon this subject between *mala prohibita* and *mala in se*, and that, if it were ever regarded, it has been wholly laid aside in the decision of the later English cases.

But with respect to the application of the doctrine for which the plaintiff here contends, as tested by the illustrations taken from our own statutes regulating the sale of various commodities, the language of Mr. Chief Justice EYRE may be appropriately applied, although the cases used for illustration differ in shade from the case now before us,— " the body of the color is the same in all."

The precise question now before us has recently been considered by the circuit court of the United States for the district of Massachusetts, in the case of *Greene & al.* v. *Collins*, Mass. District, Oct., 1870; and the decision of the court is in full accord with the views which we have expressed.   CLIFFORD, J., in delivering the opinion of the court, remarks as follows: " Marked differences of opinion are observable in the determination of courts of justice, where the facts were, in most respects, the same as in the case before the court; but the better opinion appears to be, that the mere knowledge by the vendor that the vendee, at the time of the purchase of property, intends to use it for an illegal purpose, will not, as a general rule, prevent the vendor from recovering from the vendee the value of the property.   Exceptional cases may arise in which a different rule must be applied, as where the property purchased is intended for treasonable purposes, or to commit murder, or to promote some other offence of such enormity, and so violative of the fundamental laws of society, that silence on the part of the citizen is itself a crime, or would be evidence tending to show that the seller was an accessory, before the fact, to the commission of the offence. Many cases may doubtless be cited where it is held that a contract cannot be enforced which contemplates what the law forbids, whether the act forbidden be *malum in se* or only *malum prohibitum ;* but those cases do not apply to a contract of sale which is valid by the law of the place where it is made, and where the only circumstance imputed as affecting its validity is the mere fact that the seller knows or had reason to believe that the purchaser intended to remove the property purchased into another jurisdiction, and to sell it there in violation of the law of that jurisdiction.   *U. S. Bank* v. *Owens*, 2 Pet. 527; *Harris* v. *Runnels*, 12 How. 79; *Kennett* v. *Chambers*, 14 How. 38.   Such exceptional cases may doubtless arise; but the general rule, and the one by which this case must be governed, is, that in an action to recover the price of goods sold, it is no defence that the vendor knew that they were purchased to be sold in another jurisdiction in violation of the law of that jurisdiction, provided it was not a part of the contract that they should be used for that purpose, and provided, also, that the vendor neither did nor agreed to do anything in aid or furtherance of the unlawful design beyond the mere sale with knowledge of the intent of the purchaser."

The very elaborate and exhaustive opinion of Mr. Justice CLIFFORD, in *Greene* v. *Collins,* contains a summary and review of many of the authorities to which allusion has now been made.   And concerning them, the learned judge remarks, " Cases very nearly allied, it must be admitted, have been differently decided ; but if they are carefully examined and compared one with another, the particular features by which they were distinguished are, with few exceptions, plain to be seen."   And he points out, by way of illustration, certain expressions in *Webster* v. *Munger,* 8 Gray 587, indicating that the organ of the court on that occasion was of the opinion that a sale made with knowledge of the seller that the purchaser intended to use the thing sold, in violation of law, was illegal and void, irrespective of the question whether it was an

ingredient of the contract that the goods should be so sold, or that the seller should do any act to assist or facilitate the intended illegal use or sale; but, he remarks, "the expression of such views was not necessary to the decision of the case; as the statement shows not merely that the plaintiff had knowledge of the illegal purpose of the defendant, but that he sold with reference to it, and for the purpose of enabling the purchaser to effect it; and the court, here, agrees with that court in the conclusion that the instructions given in that case, if *viewed in that light*, were thoroughly sound in principle, and that they do not conflict with the cases decided. Unless viewed in that light, the decision is directly opposed to the rule laid down in the case of *Sortwell* v. *Hughes*, 1 Curt. 245, decided by Judge CURTIS, and which is an authority in this circuit, and in the judgment of this court expresses the true rule upon the subject."

In addition to the authorities already cited, the following cases will be found to sustain the views now expressed. *Curtis* v. *Leavitt*, 15 N. Y. 15, 47; Story's Conflict Laws, § 253; *McConihe* v. *McMann*, 27 Vt. 95; *Backman* v. *Wright, ib.* 187; *Jameson* v. *Gregory*, 4 Met. (Ky.) 363; *Bligh* v. *James*, 6 Allen 572; and *Sortwell* v. *Hughes*, 1 Curt. 245, cited by CLIFFORD, J., *ante*, in which Judge CURTIS uses the following language: "The other ground of defence is, that if there were not a sale in New Hampshire, the property was sold by the plaintiffs with a knowledge that the defendant intended to sell it in violation of the law of New Hampshire; and no recovery can be had according to the law of that State.

"Having come to the conclusion that these sales were not made in New Hampshire, and it not appearing that the plaintiffs in any way participated in the defendant's sales, or did anything except to sell the property in the usual course of their business, the case of *Holman* v. *Johnson*, Cowper 341, is directly in point to show that a recovery may be had. I am not aware that this case has been overruled in England; though the extension of the principle to a sale in England, in the case of *Hodgson* v. *Temple*, 5 Taunt. 181, has been much questioned. *Cope* v. *Rowlands*, 2 M. & W. 149; *Langton* v. *Hughes*, 1 M. & S. 593; *Cannan* v. *Bryce*, 3 B. & Ald. 179. * * * I am inclined to the opinion, therefore, that I should take the same view of this case, if I were to decide it according to my own judgment of what the law is, as was taken in *Holman* v. *Johnson;* but I am relieved from this necessity by the decision of the supreme court of the United States in *Harris* v. *Runnels*, 12 How. 79. This decision goes even further than *Hodgson* v. *Temple*, and holds that where the sale was an offence by reason of a statute, but the act itself was not immoral, and the sale itself was not declared void by the statute, there was no implication, from the mere infliction of the penalty, that the contract was forbidden, and so void. I found myself unable to unite in the opinion in that case, but I am bound by it. *A fortiori*, upon the principles of that decision there is no implication that the statute forbids a sale in another State to a person who intends to bring the property into New Hampshire

and there sell it contrary to the law of that State, and no principle of the common law which renders such a sale illegal and void."

Our conclusion will have been anticipated; but it is proper to make a brief practical application of the foregoing considerations.

Stewart resided in New York, and carried on there a lawful business. In the regular course of trade he filled orders for liquors, selling and delivering them in the State of New York, as he might lawfully do. But, when he sold these liquors, he had reason to believe and did believe that Emerson intended to re-sell them in New Hampshire; and, doing business here, he was bound to take notice that such re-sale of the liquors by Emerson here would be unlawful. Still, it seems to us too clearly settled to be disputed, that the contract of sale was not invalidated by reason of Stewart's mere knowledge of Emerson's unlawful designs.

Stewart's offence, then, which is said to taint and corrupt the contract of original sale, consists solely in *soliciting* the purchase of these liquors, with knowledge that, if purchased, Emerson would be likely to re-sell them contrary to law.

But Stewart did *not* solicit such a *disposition of the liquors by Emerson;* the liquors were not sold to him *with a view* to such disposition, or to *any* disposition of them by Emerson. Stewart neither derived nor contemplated any advantage from Emerson's unlawful dealings with the goods; the payment for them was not dependent upon, nor the price enhanced by, any considerations relating to Emerson's use of them. His solicitation was that of traders in their general practice, as expressed in their advertisements and circulars—" Your patronage is respectfully solicited"—and Stewart's connection with the matter terminated with the delivery of the goods to Emerson's agent in New York.

We are of the opinion that this solicitation, accompanied by the vendor's knowledge of Emerson's course of business and his belief that these liquors would probably be disposed of in accordance with that course of business, does not bring the case within the rule whereby contracts affected by illegal considerations have been invalidated, nor, as we think, does it come within the principle which lies at the foundation of those wholesome maxims of the law which this plaintiff has invoked; none of which are infringed or sought to be impaired by this decision.

Moreover, we cannot lose sight of the fact that there is no evidence, and of course there can be no presumption in law (but rather the contrary), that these liquors *were re-sold by Emerson at all.* They may have been used, contrary to the original intent of the purchaser, for personal or family use, or for lawful chemical or mechanical purposes, by the vendee, or they may have been taken by him to a State where the sale of such goods was not prohibited by law.

" Intention," says Mr. Justice SMITH, in *Bell* v. *Woodward*, 47 N. H. 540, " is *subject to change;* and a naked *intention,* where no act has been done, is not admissible as tending to show a probability that the intention will thereafter be carried into effect."

We are bound to look at the contract alone, quite independent of subsequent transactions growing out of it. The contract was ended when Stewart delivered the goods; and subsequent dealings with the property by Emerson or others, either in furtherance of or contrary to the original design of the purchaser, cannot relate back to the original sale, and make that illegal which, at the conclusion of the original contract, was not illegal.

Suppose the vendor understands that the vendee wants the liquor for an honest and lawful purpose. Still he puts into his hands *the means* of violating the law. The buyer in fact intends to, and does, violate the law. Clearly the sale would be legal and valid. Shall the vendor's misunderstanding of the purchaser's intentions, then, taint the original contract by retro-action?

Suppose again, that, for the sake of the argument, we concede that mere knowledge of an existing intention to violate the law by the purchaser renders the contract of sale void. The illegal sale by the original vendor is made; the contract is ended; it is a void contract. But the purchaser changes his mind, becomes converted to the wholesome doctrine of temperance, and destroys the liquor, or uses it for lawful purposes. Does the subsequent diversion of purpose by the purchaser relate back to the original contract, so that *now* the original vendor can invoke our aid to recover the price fixed by the original invalid and unlawful sale?

Not only upon authority, but upon correct principle, we are compelled to disallow the plaintiff's positions. The substance of the decision in *Smith* v. *Godfrey* is, that the vendor's claim to recover for the price of spirituous liquors, sold with knowledge of the purchaser's intention to re-sell them contrary to law, will not be denied, unless it be " an ingredient in the contract that the goods shall be illegally sold, or that the seller shall do some act to assist or facilitate the illegal sale."

The present case does not differ from that, unless the mere *solicitation* by Stewart shall be regarded as an ingredient in the contract that the goods shall be illegally sold, or unless such mere solicitation shall be considered an act assisting or facilitating the subsequent illegal sale.

The term *solicitation*, here, cannot have any forced or unusual meaning. There is scarcely ever a sale and purchase among traders, without solicitation by the seller. We are unable to regard the circumstance of such solicitation as of any importance whatever, as affecting the subsequent contract of sale by Stewart, much less the later disposition of the goods by Emerson.

It has been urged in argument that the moral sense of this community requires us to place this case within the exception to the rule of comity which is ordinarily applied to foreign contracts, and to apply to the sale of spirituous liquors the principle which should be applied in the case of the sale of a deadly poison to a murderer, with knowledge of his intentions.

We have no disposition to discountenance or oppose the doctrine of the immorality or the positive sinfulness of the indiscriminate sale of

spirituous liquors, even if this were, as it is not, the appropriate place or tribunal for considerations of this character. But the remedy for the suppression of intemperance cannot be afforded by courts of law, at the sacrifice and violation of established legal principles and rules. The philanthropy of the courts is not to be exemplified by despotism and the exercise of arbitrary power. Courts act in the forms and by the rules of law, expressed by legislative will; and when the plaintiff, here, tells us that the course of legislation in this State, by its expression of repugnance to the traffic in spirituous liquors, calls upon us, by judicial power, to annul this contract, we cannot agree with him; but our reply is, such legislative expression is *not* given. Year after year, and step by step, the legislators of this State have proceeded with their enactments relative to intemperance and the sale of intoxicating drinks, mindful of the course of legislation in neighboring commonwealths, borrowing here a little and there a little from the laws of other jurisdictions; avoiding, likewise, in some instances, the example of other legislators.

Zealous reformers, constantly agitating this subject, cannot have been unmindful of the legislation, heretofore alluded to, in Massachusetts and Connecticut, whereby such a sale as this was there made ineffectual, by force of express law.

Nothing could have been easier or simpler than for our legislators to have said, if such had been their will, or such in their judgment the will or desire of their constituents, " No action of any kind shall be had or maintained in any court for the price of any spirituous or intoxicating liquor sold in any other State for the purpose of being brought into this State, to be here kept or sold in violation of law, under such circumstances that the vendor would have reasonable cause to believe that the purchaser entertained such illegal purpose." But they did not say it, as Massachusetts and Connecticut did; and having seen fit to stop short of this point in the progress of reform, it cannot be required of the courts that they should go further than the law-makers themselves, and usurp their legitimate functions.

It cannot be said that the public policy of this State forbids the en forcement of this contract, and approves the gross immorality and dishonesty which, alone, could prompt such a defence, when made by the purchaser.

In Massachusetts, as we have seen, the mandate of legislative power was laid upon the courts, with respect to contracts like this; and willingly obedient thereto, such contracts were declared illegal, and parties seeking their enforcement were turned out of court. In 1868 the mandate was withdrawn, the statute of 1855 was repealed, the common law revived, and then the vendor of goods, in a State where the sale was lawful, came to the courts of Massachusetts to recover under such a contract, and under exactly such circumstances as surround the present case, and had his claim allowed.

This court, it is to be presumed, will not be reluctant to execute the laws in the spirit of their purpose and intent. We sit here not to do our own will, nor to make laws; nor to administer them according to our own notions, but by prescribed rules.

The legislature may interfere, if the public good demands more stringent laws. Such enactments as we have referred to in Massachusetts and Connecticut do not, in any degree, conflict with any of those constitutional principles which are established for the protection of private rights or private property. Cooley on Constitutional Limitations 596, 597; *Webster* v. *Munger*, before cited; *Reynolds* v. *Geary*, 26 Conn. 179.

But so long as the people do not thus express their will, through the forms of constitutional legislation, we are bound to adhere to the principles which lie at the foundation of our commercial prosperity, and to admit no case within the exception to the rule which those principles have established, unless the demand is enforced by stronger considerations than the present case presents to our minds.

Our conclusion is that there was no error in the refusal to give to the jury the instructions desired by the plaintiff.

*Judgment on the verdict.*

SARGENT, DOE, and LADD, J. J., concurred.

BELLOWS, C. J., dissenting. The case finds that the liquors were sold on orders received by the plaintiffs in New York, where they carried on their business, and were delivered to carriers there, directed to Emerson the purchaser. And the first question is, whether the price could be recovered, if the seller knew, at the time of the sale, that they were bought to be sold in this State in violation of our laws, and they were so sold.

Second. Whether the seller could recover if he came into this State and solicited the buyer to purchase liquors, knowing they were to be sold contrary to our laws, and the buyer did afterwards buy the liquors.

Third. Whether the seller could recover, if he encouraged the buyer to buy the liquors, and sell them in this State in violation of our laws.

In the case of *Smith* v. *Godfrey*, 28 N. H. 379, it was held that mere knowledge that the liquors were to be sold in this State contrary to our laws, the sale being made in Massachusetts and valid there, would not invalidate the contract; but it is held that if it enter at all, as an ingredient, into the contract that the goods shall be illegally sold, or that the seller shall do some act to facilitate the illegal sale, the contract will not be enforced. For this doctrine the court cites *Holman* v. *Johnson*, Cowp. 341, as the leading case, as it undoubtedly is.

That was decided in 1775. Lord MANSFIELD lays it down that no court will lend its aid to enforce a claim founded upon an immoral or illegal act; and says the question is, whether the plaintiff's demand is founded upon the ground of any immoral act or contract, or upon the ground of his being guilty of anything which is prohibited by a positive law of this country. An immoral act, he says, it certainly is not, for the revenue laws, as well as the offence against them, are all *positivi juris*; and, on the other hand, the sale is complete by the delivery of the goods in Dunkirk, the place of sale. The seller, indeed,

knows what is going to be done with the goods, but has no concern in the transaction itself.

In another part of the opinion, he says, that no country ever takes notice of the revenue laws of another country.

It is evident, then, that upon the question whether the court should lend its aid here, on the ground that the contract was immoral, the turning point was, that the transaction in which the buyer was engaged was *malum prohibitum* and not *malum in se;* and there is good reason to believe that the decision would have been different had the transaction been *malum in se.*

*Faikney* v. *Reynous,* 4 Burr. 2069, was earlier than *Holman* v. *Johnson,* having been decided in 1767, and it was there held that a bond to reimburse the plaintiff for one half of a sum of money paid by him to compound differences in a stock-jobbing transaction, might be enforced. The opinion was delivered by Lord MANSFIELD; and he put it upon the ground that the offence was not *malum in se,* but only prohibited by act of parliament.

This case was cited by counsel in the argument of *Holman* v. *Johnson,* and it seems there to have been followed.

The case of *Petrie* v. *Hannay,* 3 T. R. 418, decided in 1789, was very much like *Faikney* v. *Reynous,* and followed that authority, although Lord KENYON dissented, and GROSE, J., yielded to it with great reluctance.

In all these cases the turning point was, that the illegal acts were *malum prohibitum* only, and not *malum in se.* Since that time, however, this distinction has been entirely obliterated, both in England and New Hampshire, as I shall proceed to show.

In *Lightfoot* v. *Tenant,* 1 B. & P. 551, it was decided that a contract to pay for goods sold to defendant to be shipped to Ostend, and from there to the East Indies, to be sold clandestinely and contrary to act of parliament, the plaintiff knowing the purpose for which they were bought, could not be enforced.

The case was decided in 1796. In the opinion by EYRE, C. J., he puts the strong case of selling arsenic, with the knowledge that it is to be used by the buyer to poison another; and he says that other cases, where the means of transgressing a law are furnished with knowledge that they are intended to be used for that purpose, will differ in shade more or less from this strong case; but, the body of the color is the same in all. No man, he says, ought to furnish another with the means of transgressing the law, knowing that he intends to make that use of them.

In Story's Conflict of Laws, sec. 253, in referring to *Holman* v. *Johnson,* and other authorities of that class, he says, the result of these decisions certainly is, that mere knowledge of the illegal purpose for which goods are purchased will not affect the validity of the contract of sale of goods intended to be smuggled into a foreign country, even in the courts of that country; but that there must be some participation or interest in the act itself. It is difficult, he says, however, to reconcile them with the strong reasoning of Lord Chief Justice EYRE,

in an important case on the same subject, that is, *Lightfoot* v. *Tenant*, above; and after quoting passages from it, he says, the wholesome morality and enlarged policy of this passage make it almost irresistible to the judgment.

In *Aubert* v: *Maze*, 2 B. & P. 371, decided in 1801, it was decided that where two persons engage in partnership in an illegal business, made so by act of parliament, as insurances for instance, and one pay an entire loss, he cannot recover of the other his share; and it is put upon the ground that the transaction was a breach of an act of parliament, and the distinction between acts *malum in se* and *malum prohibitum* is reprobated. The cases of *Faikney* v. *Reynous* and *Petrie* v. *Hannay* are seriously questioned, and said to be in opposition to several subsequent decisions.

In *Booth & al.* v. *Hodgson & al.*, 6 T. R. 405, decided in 1795, the same doctrine was held as in *Aubert* v. *Maze.*

In *Langton & al.* v. *Hughes*, 1 M. & S. 593, decided in 1813, it was held that one who sells drugs to a brewer, knowing that they were to be used in the brewing contrary to act of parliament, could not enforce the payment of the price. Lord ELLENBOROUGH says, that if one sells the drugs with the knowledge that they are meant to be mixed, he may be said to cause or procure, *quantum in illo*, the drugs to be mixed. LEBLANC, J., says it is an established principle that the court will not lend its aid in order to enforce a contract entered into with a view of carrying into effect anything which is prohibited by law; so that if a person enter into a contract which is to aid the brewer in the breach of this law, he shall not be permitted to recover.

So in *Cannan* v. *Bryce*, 3 B. & Ald. 179, it was held that money lent, and applied by the borrower, for the express purpose of settling losses on illegal stock-jobbing transactions, cannot be recovered back by him, even though the lender was no party to such transactions.

ABBOTT, C. J., who delivered the opinion of the court, says, the authority of *Faikney* v. *Reynous* and *Petrie* v. *Hannay* has been questioned in several subsequent cases, and the distinction between *malum prohibitum* and *malum in se* was disallowed in *Aubert* v. *Maze;* and he says, we think no such distinction can be allowed in a court of law; the court is bound, in the administration of the law, to consider every act as unlawful which the law has prohibited to be done.

He goes on to say, as the statute in question has absolutely prohibited the payment of money for compounding differences, it is impossible to say that the making such payment is not an unlawful act; and if it be unlawful in one man to pay, how can it be lawful for another to furnish him with the means of payment? and he says he is speaking of a case wherein the means were furnished, with a full knowledge of the object to which they were to be applied, and for the express purpose of accomplishing that object; and he thinks the case cannot be distinguished from *Langton & al.* v. *Hughes.* In *Ritchie* v. *Smith*, 6 M. G. & S. 462, it was decided that an agreement entered into for the purpose of enabling one of the parties to it to contravene a statute passed for the protection of public morals, cannot be enforced in a court of law.

In that case the suit was brought to recover a weekly sum for the use of a tap-room, let to the defendant for the purpose of selling divers liquors without license. The court holds that the license · from the magistrates is for the protection and preservation of the public morals, and the prevention of crimes and offences which are subversive of good order and public safety. WILDE, C. J., says, I cannot conceive a party to be more conducive to the commission of an offence, than by furnishing the place in which it is to be committed.

If this be so in respect to furnishing the place for carrying on such illegal traffic, for a much stronger reason would it apply to the furnishing the very thing itself for the purpose of being illegally sold.

These authorities show clearly that the distinction between acts *malum in se* and *malum prohibitum*, adopted in *Faikney* v. *Reynous*, *Petrie* v. *Hannay*, and *Holman* v. *Johnson*, is no longer recognized in England.

The case of *Biggs* v. *Lawrence*, 3 T. R. 454, holds that in respect to brandy, sold by a firm residing mostly in England, but the brandy delivered in Guernsey, and for the purpose of being smuggled into England, the price could not be recovered in the English courts. The brandy was sold by one of the partners living in Guernsey, but the court regarded it as a contract made in England, and in that way distinguish it from *Holman* v. *Johnson*, which is recognized as law. This case shows clearly that the furnishing the subject of an illegal traffic stands on the same footing as furnishing a place to carry it on, although the illegality is the result of positive law; and it shows also a disposition not to extend the doctrine of *Holman* v. *Johnson*. In fact, it repudiates the distinction between contracts *malum in se* and *malum prohibitum*.

Of the same general character is *Clugas* v. *Penaluna*, 4 T. R. 466. There, the goods were sold in Guernsey, by a resident there; and the court said the only question was, whether there was sufficient evidence to go to the jury of this being a smuggling transaction; and Lord KENYON says, that although the mere selling of the liquors might not be immoral, yet if they were sold there by a subject of this country, with a view to evade the laws of this country, it savors strongly of immorality : and it was held, that although it might perhaps not be against the laws of Guernsey, payment cannot be enforced by judicial process in any court in this country. ASHURST, J., was of opinion that although this might be a legal contract that could be enforced in the courts of Guernsey, it could not be in England. BULLER, J., thought the case distinguished from *Holman* v. *Johnson* by the fact that here the brandy was packed in ankers, which are used for smuggling.

GROSE, J., said that if a Guernsey man collude with a person living here to defeat the laws of this country, he shall not call in aid the laws of this country.

Lord KENYON also placed stress upon the fact that the plaintiff was a subject of Great Britain, whereas it was otherwise in *Holman* v. *Johnson*.

It will be observed that two of the judges are of the opinion that no

recovery could be had in the English courts, even though the contract might be legal in the place where it was made.

In *Waymell* v. *Reed & al.*, 5 T. R. 599, the plaintiff was a foreigner, living at Lisle, and sold lace which he knew was intended to be smuggled into England, and which he packed in a peculiar manner to facilitate that object; and it was held that he could not recover.

These cases limit very materially the doctrine of *Holman* v. *Johnson*, and show a disposition of the English courts to seize upon slight circumstances of distinction.

The circumstance of packing the goods in a peculiar manner is said to assist or facilitate the breach of the laws of the country into which they are to be introduced; but after all, this is only evidence of the knowledge of the seller of the purpose of the buyer, and adds nothing of any importance to the substantial nature of the assistance in violating the laws of another country, which comes from furnishing him with the very means of doing it, with the knowledge that they are to be so applied.

The mode of packing is a mere incident to the subject matter of the contract, without which the law could not be violated; and I think the adoption of that distinction is due to a desire in the English courts to limit the application of *Holman* v. *Johnson*, which, under the influence of the great name of Lord MANSFIELD, they are reluctant to overthrow.

In our own State it is decided that money knowingly lent to game with, cannot be recovered—*Cutler* v. *Welsh*, 43 N. H. 497. BELL, C. J., in that case, says the law is well settled to that effect; and he cites many authorities to that point, and among them *Langton* v. *Hughes*, 1 M. & S. 593, and *Cannan* v. *Bryce*, 3 B. & Ald. 179.

So it is in Massachusetts, *White* v. *Buss*, 3 Cush. 448, where SHAW, C. J., lays it down as well settled, that any promise, contract, or undertaking, the performance of which would tend to promote, advance, or carry into effect an object or purpose which is unlawful, is in itself void, and will not maintain an action. He says the law which prohibits an end, will not lend its aid in promoting the means designed to carry it into effect; and in this respect the law gives no countenance to the old distinction between *malum in se* and *malum prohibitum*. That which the law prohibits in terms, or by affixing a penalty to it, is unlawful, and it will not promote, in one form, that which it declares wrong in another; and he cites for this doctrine *Aubert* v. *Maze*, 2 B. & P. 371, and *Cannan* v. *Bryce*, 3 Barn. & Ald. 179, before cited. So it was held that money lent to ransom a ship, contrary to act of parliament, could not be recovered. *Webb* v. *Brooke*, 3 Taunt. 6.

The doctrine that there is now no distinction between acts *malum in se* and *malum prohibitum*, is recognized in *U. S. Bank* v. *Owens & al.*, 2 Peters (U. S.) 527, and in *Harris* v. *Runnels*, 12 How. (U. S.) 79.

In *White* v. *Buss*, SHAW, C. J., says, that the reason why such a contract is void is, that it is to give effect to a proceeding prohibited by law as against public policy. See, also, *Emery* v. *Kempton*, 2 Gray 257. It will be observed, also, that since the decision in *Cutler* v. *Welsh*, before cited, the doctrine there held has been incorporated into the Gen. St., chap. 254, § 9.

It is clear, then, that all contracts made here in violation of the law of the State, whether by direct prohibition, or by the imposition of a penalty, and whether such acts or contracts are *malum in se* or not, are invalid, and cannot be enforced in our courts; and the same is true in respect to all contracts for obtaining the means of violating such laws, with knowledge of the purpose to which they are to be applied.

As to contracts among our own citizens, there can be, since the decision in *Cutler* v. *Welsh,* no controversy, for the doctrine there announced is broad and of general application.

The question then is, whether our courts are required, as matter of comity, to enforce a contract made abroad in favor of a citizen of another country, which it would not enforce in favor of one of our own citizens, upon the ground that it was a contract knowingly made to furnish the means of violating a positive law of our own State, and contrary to public policy.

In considering this question, it is readily conceded that the authority of *Smith* v. *Godfrey* should not hastily be disregarded or overthrown without the most cogent reasons for it; but there are circumstances to be considered that in my judgment materially diminish its weight at the present time.

That decision was in 1854; and since then the law in respect to the traffic in spirituous liquors has undergone a great change, so that there can now be no question that the traffic in such liquors, contrary to law, is immoral. Immoral, not only because it is a violation of positive law, which is everywhere, of late years, coming to be regarded as of itself immoral; but immoral, because in its consequences it is highly destructive to the peace, good order, and morals of society, the fruitful parent of crime, poverty, insanity, and almost every form of human debasement and suffering. Intemperance, indeed, is the master vice of the age, and imperatively calls for the united exertions of all the wise and the good in the community to find some remedy for its great and growing evils; and I cannot but regard the illegal traffic in spirituous liquors as clearly immoral.

It is also to be observed, that since the decision in *Smith* v. *Godfrey,* the case of *Cutler* v. *Welsh* was decided, settling fully the doctrine that furnishing means to violate a positive law of the State is in itself illegal, though the act is not *malum in se,* and a contract arising out of it cannot be enforced in this State; thus repudiating the doctrine of *Faikney* v. *Reynous* and *Petrie* v. *Hannay,* and qualifying materially the doctrine of *Holman* v. *Johnson.*

Looking at the question in its broadest aspects, it is this: whether a sale of liquors, made by a citizen of another State, in that State, to a citizen of this State, to be brought here and sold in violation of our laws, the seller knowing that such is the purpose, is to be regarded by our courts as valid and to be enforced.

The purpose of the buyer in this purchase is, to violate our laws, to commit an indictable offence; and the seller knows it. Is he not then himself morally guilty of the same offence, when he knowingly puts into the hands of another the means of committing it?

Does it change the character of the act morally, that when he does so he stands the other side of the State line, where he fully understands what our law is, and that the offence is to be committed? Does it not come within the strong denunciations of EYRE, C. J., in *Lightfoot* v. *Tenant*, before cited, just the same as if he stood on the New Hampshire side of the line?

Take the case of money lent to game with, or weapons furnished to commit a crime with, or to make war on a nation with whom we are at peace: can the character of the act depend on the locality of the State line, whether on the one side or the other of the parties, when making the contract?

*In foro conscientiæ*, it is undeniable that there can be no difference. If the acts were done in this State, it is clear that no court here would enforce a contract growing out of them; and so it would be if done out of the State, but by citizens of this State, as is shown by the cases of *Biggs* v. *Lawrence* and *Clugas* v. *Penaluna*, before cited.

What principle then of comity requires us to enforce such a contract in favor of a citizen of another State, when his contract is made with full knowledge of its object, and has the same moral taint that would deprive a citizen of our own State of all remedy?

The purpose of the buyer being to break our laws, the seller, having knowledge of it, must be regarded as participating in the offence,—as a party to a sale, made to defraud creditors, is held to participate in that intent if he had knowledge of it, whether he really had any purpose to defraud any body or not.

And so it is generally in such things,—a person having knowledge of an act of fraud and in any way lending his aid to effect it, is deemed a party to it, whatever his real motive.

As to *Holman* v. *Johnson*, it is clear that Lord MANSFIELD considered the contract not to be immoral, and upon the ground that the revenue laws, as well as the offences against them, are all *positivi juris*, and not *malum in se*. His view of the subject is seen in the expression, that no country ever takes notice of the revenue laws of another.

Had that great judge regarded the contract as immoral, there can be no doubt that his decision would have been the other way.

Whatever might have been the view in respect to the breach of a revenue law by a citizen of a foreign country, we can entertain no doubt that it is an immoral act in such citizen to aid in a violation of the laws for the suppression of intemperance, by furnishing the means to do it; and even in respect to the revenue laws, any aid furnished to facilitate such violation, as by packing the goods in a peculiar way for that purpose, would invalidate the contract.

It is to be observed, also, that the doctrine of *Holman* v. *Johnson* was applied in a case where, according to the habits of the times, the breach of the revenue laws, especially by a citizen of a foreign country, was regarded as involving less moral turpitude than a breach of almost any other law, although now such distinctions are in law not recognized.

It should also be considered that, owing to the insular condition of Great Britain, a doctrine that might not be productive of great mis-

chief there might be wholly unsuited to a country like ours, consisting of a family of contiguous States, having constant and large intercourse, a common origin, a similarity of laws and institutions, and a considerable familiarity with each others' policy and laws; add to this the fact that they are all united under one general government, and that the citizens of one State are entitled to all the privileges of citizens of the several States, and we have a case where, on a question of this sort, the inhabitant of a contiguous State can hardly be looked upon as a foreigner unacquainted with our laws, but really occupying a position enabling him to contribute to the violation of laws with about the same effect as if he lived among us, and was privileged to supply to every body the means of breaking our laws. If it be desirable to enforce our laws for the suppression of intemperance, a policy that shall protect a traffic just outside our limits, by which everybody may be supplied with the means of breaking those laws, would be perfectly suicidal.

I am aware that it is said that the person who buys these liquors does not deserve any protection against the claims of the seller; and that is admitted to be true : but this is a totally inadequate view of the subject. It is not for the sake of such buyers, but to suppress an immoral and mischievous traffic by refusing to enforce contracts growing out of it.

So long as this rule in *Holman* v. *Johnson* is recognized, we shall continue to have upon us an army of liquor dealers in the neighboring States, using all the skill which experience has gathered to induce our citizens to violate the laws, and to teach them how to do it with the best chance of impunity.

From such a power and from such doctrines great mischief is to be apprehended; and I cannot conceive that we are under obligation, as matter of comity, to enforce contracts of that kind. It is a case, indeed, where we are excused upon the ground that the traffic is highly injurious to us.

If the authority of *Smith* v. *Godfrey* is too firmly established to be shaken, and mere knowledge in the seller is not enough to render the contract invalid, the question then is, whether the coming into this State and soliciting orders for these liquors, or encouraging the defendant to buy and sell the liquors in this State in violation of law, would render such sale invalid.

The coming into this State and soliciting orders for liquors, and encouraging the party to buy and sell contrary to law, is to my mind a more direct participation in the violation of the law, than the packing the goods in a convenient way for smuggling, inasmuch as here is a direct request, or what is equivalent to it, to break the law.

In *Territt & al.* v. *Bartlett*, 21 Vt. 184, the order for the liquors was given in Vermont, but the sale completed in New York, the seller knowing that they were to be sold in violation of law;—it was held that for all practical purposes it must be considered that the sale was made in Vermont; and the plaintiff could not recover. A similar doctrine was held in *Howe & al.* v. *Stewart*, 40 Vt. 145.

In *Aiken* v. *Blaisdell*, 41 Vt. 655, where the plaintiff forwarded the liquors from New York to defendant, in a disguised form, to evade detection, it was held that he could not recover; the court holding that positive acts in aid of the unlawful purpose, however slight, are sufficient.

In *Wilson* v. *Stratton*, 47 Me. 120, where orders for liquors were given in Maine, and the goods delivered in Boston, the court speaks in this wise, after saying that plaintiffs could not be ignorant of the existence of their laws prohibiting this traffic. " Yet, in the face of these laws and of the known and settled policy of the State, they send their agents into the State to seduce our citizens to enter into contracts, looking directly to their violation; and after having succeeded by such solicitation in inducing them to enter into such a contract, they come before our courts and ask them, on the principle of comity, to enforce them on the technical ground that they were completed in another State. Such proceedings are manifestly in fraud of the laws of the State, and cannot be upheld upon any sound principle of comity." In *Webster* v. *Munger*, 8 Gray 584, it was held that a sale made in one State, with a view to a re-sale in another contrary to law, is invalid, and would not be enforced in the latter State; and THOMAS, J., holds that mere knowledge of the purpose would defeat it. From these cases, as well as the others cited from the law reports, it is evident that the courts, both in England and this country, are disposed to lay hold of slight circumstances to avoid the doctrine of *Holman* v. *Johnson;* and I think the coming into this State and soliciting orders, and encouraging the sale of liquors contrary to law, is a much more decided participation in the illegal act than many of the cases reported, where it is held to make the seller a party.

If I understand aright the opinion of Mr. Justice CLIFFORD in *Greene* v. *Collins*, the distinction he makes is between a case of *mere* knowledge in the seller, and acts done by him to facilitate the violation of the law; and he illustrates his view by reference to the English case of *Brown* v. *Bennett*, 1 Camp. 349, where the plaintiff furnished articles of equipage or dress to a female keeping a house of ill-fame, for the purpose, and of a character, to enable her to make a display; and he says that the decision was upon the ground that the act of supplying a female engaged in such immoral practices would warrant a jury in finding that the articles were intended to facilitate the objects of her vocation; and he says that sales under such circumstances may well be presumed to have been made with the intent to facilitate the objects of the purchaser, and if so, then the contract is clearly void.

He also says that different rules have been sometimes applied in the construction of contracts made for the sale of goods in one country, intended to be exported into another in violation of its revenue laws; but he declines to enter that field of inquiry, as such a question is not raised, although the liquors, the subject of the suit, were sold in Rhode Island to be used in Massachusetts, the sale being valid by the laws of the State where it was made.

If the liquors were sold with the full knowledge that the buyer was

to sell them in this State in violation of our laws, a jury could not fail to find that the sale was made to facilitate and aid the buyer in such violation.

What, indeed, could more decisively aid in such breach of the law than to furnish him upon credit with the very means to do it, knowing that they are to be so used.

It would be a reproach to the intelligence of a jury to suppose that they could hesitate so to find it, or to find that this was encouraging the buyer to violate the law.

The fact is, that in all cases where one man furnishes another with the means to commit a crime, knowing that they are to be so used, the law deems him to be a participant in the guilt of the offence; and this applies in its full force to the case under consideration. Nor is it any answer to say that the original intention of the buyer may be abandoned, and the liquors sold elsewhere, and lawfully; but if the law is in fact broken, and the seller furnishes the means to do it knowing that they are to be so used, he cannot be excused by the fact that the means *might* have been otherwise used, any more than, in case he had furnished another with arsenic to poison a man, he could be excused by alleging that it might not have been used for the purpose for which it was furnished, or that it might not have been effectual. In truth, when liquor dealers across the line of our State are habitually aiding our citizens in the violation of laws made for the protection not only of the public morals but of the very lives of our people, there is an impudence in coming to our courts, and asking them to enforce contracts growing out of such traffic, that is almost sublime.

It is obvious that they are doing all they can do to render inoperative a law which the courts are bound to enforce so long as it remains on the statute book; and then they ask the same courts to protect them in these efforts to break down our laws, by treating their contracts as meritorious and legal.

To do this would be extending the doctrine of comity to a point altogether inconsistent with the public safety.

By our laws no spirituous liquors can be sold here except by agents duly appointed by law; and to ensure the sale of pure liquors only, these agents are required to purchase of persons designated by the governor alone; and those persons are required to give bonds to ensure the furnishing of pure, unadulterated liquors. With a full knowledge of these provisions and in utter disregard of them, liquor dealers across the line systematically endeavor to nullify these provisions, and deprive us of all security against the introduction of adulterated and poisonous liquors; and the argument is, that their conspiracies against our laws are carried on beyond the limits of this State, and therefore we are bound to regard them as not only not illegal, but of such a character that our courts are bound to enforce contracts made to accomplish this nullification of our laws.

If this be so, it is due to a decision made long ago by a very eminent judge in a matter involving few of the moral aspects of the present question, and upon views and doctrines which have since been dis-

carded or modified, and which decision has been, incautiously as I think, followed in many subsequent cases.

I feel sure, however, that this doctrine cannot stand the test of a careful examination upon principle, and I therefore am ready to hold that comity does not require us to enforce the contract now in question.   Upon these views I am compelled to dissent from the opinion of the° majority of my brethren.

SMITH, J., concurred.